Argued and submitted March 5, 2008, decision of Court of Appeals and judgment of circuit court affirmed October 1, 2009

## STATE OF OREGON,
*Respondent on Review,*

v.

## JUSTIN CLARK PERRY,
*Petitioner on Review.*

(CC 03-06-33108; CA A125135; SC S055142)

218 P3d 95

Daniel J. Casey, Portland, argued the cause and filed the brief for petitioner on review.

David B. Thompson, Senior Assistant Attorney General, Salem, argued the cause and filed the brief for respondent on review. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

GILLETTE, J.

### GILLETTE, J.

Defendant was charged with various crimes based on a child's report that defendant had sexually abused her. The report was made several months after the crimes allegedly had occurred. At defendant's trial, the court permitted an expert witness for the state to testify about a phenomenon known as "delayed reporting."[1] The expert testified that children who have been sexually abused often delay in reporting that abuse. The testimony was intended to rebut an inference that defendant sought to have the jury draw that the child's failure to report defendant's alleged acts of abuse immediately indicated that the abuse never had happened. After a jury convicted him of all charges, defendant appealed to the Court of Appeals, claiming that admission of the expert's testimony about delayed reporting was reversible error. The Court of Appeals affirmed without opinion. *State v. Perry*, 213 Or App 391, 161 P3d 955 (2007). We allowed defendant's petition for review and now affirm the decision of the Court of Appeals and the judgment of the trial court.

The facts essential to the legal issue on review are not in dispute. Early in 2002, defendant and his wife agreed to serve as foster parents for the wife's 10-year-old niece (victim) and her eight-year-old brother. In February 2002, the two children moved into the couple's Northeast Portland home.

Nothing occurred to raise questions about the placement of the children until December 2002, when the victim and her brother attended a Christmas party that was held by the Oregon Department of Human Services (DHS) for foster children and their families. The victim's biological father was there, and victim was able to converse with him without supervision. In the course of their conversation, the victim reported to her father that defendant had touched her sexually on numerous occasions some months previously and that she did not want to return to defendant's home. The victim

---

[1] We understand from the testimony that "delayed reporting" is the label used by professionals in the field to describe a situation in which a sexually abused child does not report an abusive event immediately but, instead, reports it some time later.

repeated her story to a DHS caseworker who, in turn, arranged to have her evaluated by an organization known as Child Abuse Response and Evaluation Services (CARES).

CARES personnel who examined the victim found no physical evidence of sexual abuse but concluded, nonetheless, that her report of sexual abuse was credible. Based on the victim's report, defendant thereafter was charged with one count of unlawful sexual penetration in the first degree, one count of sodomy in the first degree, and nine counts of sexual abuse in the first degree.

Before his trial on the foregoing charges, defendant filed two motions *in limine* challenging the admissibility of certain expert testimony that the state intended to introduce. Although the actual motions are not in the trial court file, we can determine from the transcript that one motion sought to limit expert testimony respecting the phenomenon known as "delayed reporting" by sexually abused children—the subject at the heart of this case. The other motion is not pertinent to our inquiry.

In an OEC 104[2] hearing held in response to defendant's motions *in limine*, the state's expert, Dr. Keltner, answered questions about her intended testimony at trial. She testified that she was the medical director of CARES Northwest and held various advanced degrees, including an M.D. and a Ph.D. in biometry; that the medical profession recognizes a medical diagnosis of child sexual abuse; that CARES uses a widely accepted medical model for child sexual abuse assessment; that CARES examiners and interviewers receive extensive specialized training; and that there are specialized journals and other peer reviewed literature devoted to the subject of child sexual abuse. Keltner acknowledged

---

[2] Oregon Evidence Code (OEC) Rule 104 provides, in part:

"(1) Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege or the admissibility of evidence shall be determined by the court, subject to the provisions of subsection (2) of this section. In making its determination the court is not bound by the rules of evidence except those with respect to privileges.

"(2) When the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition."

that "we do not do scientifically case-controlled research" in the area of child sexual abuse, but noted that the same was true for a "majority of medical processes."[3]

The prosecutor questioned Keltner about a phenomenon known as "delayed reporting" by child victims of sexual abuse. Keltner testified that such a phenomenon was "common" and "well understood," and that there was a body of literature dealing with the issue. Keltner also testified that a separate CARES study of delayed reporting, although not peer reviewed, was consistent with the "national experience" as reported in the literature[4]—i.e., that, in cases of children with "abnormal [physical] exams," there was a delay in reporting in a majority of those cases.

On cross-examination, Keltner acknowledged that there was no way to determine whether any particular child who delays a report of sexual abuse is telling the truth. She testified, however, that people in the field "do understand that disclosure is a process and that [the] first part of the process is denial." She also stated that, according to "studies looking at false allegations in children[,] * * * the thing they're most likely to lie about is that abuse did not occur rather than lying falsely about abuse occurring."

Thereafter, the prosecutor argued that the state had established a foundation for admitting Keltner's testimony "to explain the delay in reporting." In response, defendant argued that Keltner's testimony regarding delayed reporting was inadmissible on three grounds—(1) it was not scientifically valid under the multifactor analysis described in *State v. Brown*, 297 Or 404, 687 P2d 751 (1984) and *State v. O'Key*, 321 Or 285, 899 P2d 663 (1995); (2) it was irrelevant; and (3) it was unfairly prejudicial. Defendant noted that Keltner had admitted that there was no scientifically controlled

---

[3] Keltner explained that no true controlled studies would be possible within the bounds of medical ethics: Dividing children into two groups and then intentionally abusing one of the groups would be a perversion of science of Orwellian proportions.

[4] Keltner referred in particular to a study "done by Sorenson and Snow in the early 90s," which "found that 72 percent of the children that they evaluated [who had been sexually abused] initially denied abuse."

research on the issue of delayed reporting and, thus, "no way to test the rate of error." Defendant also noted that Keltner

> "didn't give any evidence that this * * * really what is syndrome evidence about delayed reporting, she cited no specific literature to support that. She said something about when children have abnormal exams showing abuse that 90 percent of the time they delay in reporting. But I don't think that's enough."

Finally, defendant argued that the delayed reporting testimony was irrelevant and unfairly prejudicial because "the state ha[d] failed to establish any link between this child and a delay in reporting, only that children tend to delay in reporting."

Ultimately, the trial court rejected defendant's objections and ruled that Keltner could testify "with respect to the scientific validity of delayed reporting as a characteristic of sexual abuse." The court's ruling took place in this brief colloquy:

> "[THE COURT:] Defense Motion in Limine No. 2, whether the expert is qualified, we already said that the expert is qualified. Whether the expert can give testimony with respect to the scientific validity of delayed reporting as a characteristic of sexual abuse, I will allow that testimony based on the references to the literature, the peer review of cases that are done both nationally—or nationally and here locally.

> "I think it's the type of evidence that—I think the testimony has established that it's the type of evidence that is found to be scientifically valid within the group of people who specialize in this area.

> "Having said that, I would have expected to have a little more detail in the—in the presentation with respect to [the] delayed reporting phenomen[on] itself.

> "[THE PROSECUTOR:] I'm sorry?

> "[THE COURT:] I would have expected to have a little more detail with respect to delayed reporting as a characteristic of this phenomenon. And specifically we didn't hear any testimony about what constitutes delayed reporting. Is it an hour, is it a day, is it a month, is it a year, is it ten years, what is it?

"[THE PROSECUTOR:]   I will certainly flesh that out.

"[THE COURT:]   All right. So I would expect that. So I'm—as I said, I'm going to allow that testimony."

As that colloquy reveals, the trial court's ruling was conditional in nature: Keltner could testify, but the trial judge expected her to explain more fully what "delayed reporting" was. Moreover, her testimony remained subject to any specific objections that defendant might make at trial. Also implicit in the court's ruling was the idea that defendant could move for a limiting instruction on the uses that the jury could make of the testimony.

The case proceeded to trial before a jury. In its case-in-chief, the state presented the victim's testimony, together with a videotape of an interview of the victim by CARES personnel. It also presented testimony from several other witnesses, including Keltner. Defendant took the stand and denied any wrongdoing. The jury convicted him of all charges, and these appellate proceedings ensued.

We emphasize the limited nature of the issue before us in this case. Defendant does not assign error to any ruling made by the trial court after the jury was empanelled and sworn. (Defendant made only a single objection during Keltner's testimony at trial, and he does not assign error to the ruling on that objection.) Instead, defendant rests his arguments entirely on the trial court's rulings at the conclusion of the OEC 104 hearing. Defendant's strategy is a permissible one, of course, but it highlights both the utility and the limits to the utility of motions *in limine*: A general ruling that a certain type of evidence (even scientific evidence) is minimally relevant under OEC 401[5] and OEC 702[6] does not relieve a party of the obligation to make specific objections to

---

[5] OEC 401 provides:

" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

[6] OEC 702 provides:

"If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise."

discrete pieces of that evidence at trial, if the dynamics of the trial process reveal other grounds for objection.

We turn, then, to the three arguments that defendant made at the close of the OEC 104 hearing. As noted, they were that (1) Keltner's testimony did not meet the legal test for "scientific" evidence; (2) the evidence was not relevant; and (3) the evidence was unfairly prejudicial. We address the latter two arguments first. In doing so, we add the following contextual observation: Much of defendant's argument, both at the OEC 104 hearing and to this court, consists of asserting that Keltner's delayed reporting testimony was being offered to show that the victim's delayed reporting *affirmatively established* that the victim had been sexually abused.

In considering that argument, however, two things must be kept in mind: (1) Because defendant's case was built, in part, on the proposition that the victim's delay in reporting gave rise to an inference that she had *not* been abused, Keltner's testimony served a legitimate purpose—to show that there was a scientific basis for rejecting that proposition—*i.e.*, a treating health care professional would not necessarily view the delay as a reason to discount the victim's story. (2) Even if, at the OEC 104 hearing, Keltner characterized delayed reporting as a normal "part of the disclosure process" and in other ways suggested through her testimony that delayed reporting might have some affirmative diagnostic value, she never stated that delayed reporting was affirmatively probative of whether sexual abuse actually had occurred. In fact, she specifically conceded that delayed reporting itself was *not* a diagnostic tool in that regard.[7] In

---

[7] Defendant's counsel asked Keltner the following questions, among others, and received the following answers:

"[DEFENSE COUNSEL:] In a situation where you don't have a confession—

"[THE WITNESS:] Yes.

"[DEFENSE COUNSEL:] —and you don't have an abnormal [physical] exam and you don't have a—a verdict at trial, there is no way to distinguish between someone who has delayed in reporting who is telling the truth and someone who's delayed in reporting [who] is not telling the truth?

"[THE WITNESS:] There is no single test that can give you a hundred percent validity and reliability. * * *

"[DEFENSE COUNSEL:] But there's no test at all, right, Doctor?

light of those facts, we think that it was defendant's responsibility to point out to the trial court—either by means of some generalized discussion of the matter at the OEC 104 hearing or by means of specific objections at trial—the line between testimony that tended to rebut defendant's theory that the victim's delayed reporting was affirmative evidence of fabrication and testimony that instead presented delayed reporting as affirmative evidence of abuse. Defendant did not do that, and did not make distinct arguments about the relevance, unfair prejudice, and scientific validity of the two kinds of evidence.

■    With those points in mind, we turn first to the OEC 401 issue, *i.e.*, the issue of relevance. As noted, defendant's theory of the case was that the victim was fabricating. One part of that theory was that a trier of fact could infer that the victim's delay in reporting tended to show that the events about which the victim testified had never happened. But Keltner's testimony that similar delayed reporting often is seen in verified cases of child sexual abuse tended to counter that inference. The testimony was relevant in that respect at least, *i.e.*, it had some "tendency to make the existence of [a] fact that is of consequence to the determination of the action more probable or less probable." OEC 401.

It could be argued from this record that the state had a further purpose in mind: In the OEC 104 hearing, the prosecutor stated that the evidence should be admitted because it was "an important piece of the diagnostic process." But the existence of that second purpose—if, in fact, it did exist—adds nothing to the inquiry whether Keltner's testimony could be admitted for the reason already discussed: If defendant was attempting to make something of the victim's delay

---

"[THE WITNESS:] * * * [Y]ou are correct, there's no—

"[DEFENSE COUNSEL:] You said there's no 100 percent test, but there's no way to tell at all, is there, under the hypothesis I've given you?

"[THE WITNESS:] No. * * *"

Thereafter, defense counsel asked one other important question:

"[DEFENSE COUNSEL:] * * * [W]hat [another recognized expert] says is that this syndrome [of delayed reporting] is not a diagnosis but a—but a counseling tool; is that right?

"[THE WITNESS:] Correct. * * *"

in reporting (and he was), then the state was entitled to meet that argument. If the state sought to elicit the testimony for a different purpose as well, then defendant was free to object to Keltner's testimony on that more limited basis. *See, e.g., State v. Camarena*, 344 Or 28, 33 n 3, 176 P3d 380 (2008) (objection to evidence as a whole not basis for reversal, if some of evidence was admissible). He did not do so. Defendant also was free to seek an appropriate limiting instruction. But, again, he did not.[8] If defendant thought that Keltner was adding a different (and irrelevant) "spin" to the relevant facts that she was reporting, then it was for the defendant to point that out and to seek to limit her testimony. The trial court did not err in ruling that, in this context, Keltner's testimony was relevant.

■ Neither, in our view, did the trial court demonstrably err in ruling that Keltner's testimony did not violate OEC 403.[9] That is, the court was entitled, on this record, to rule that the probative value of Keltner's testimony was not substantially outweighed by the danger of unfair prejudice or confusion. We already have established that the testimony was relevant in that it challenged defendant's theory that the victim's delayed reporting affirmatively indicated that her report was a fabrication. But defendant contends that the testimony posed a substantial danger of unfair prejudice—the likelihood that jurors would find that the complainant in fact *was* abused simply because she waited to make her allegations.

In our view, that danger of unfair prejudice is not inherent in the central thesis of Keltner's testimony that

---

[8] The trial court's ruling was not a model of clarity, mentioning, as it did, "delayed reporting as a characteristic of sexual abuse." But the ruling also was correct at least in part—as we have explained—and defense counsel was left with the awkward necessity of accepting the outcome or pursuing clarification. We are not called on in this case to decide whether the "delayed reporting" phenomenon ever would be admissible as a characteristic of a diagnosis of "sexual abuse." Respecting the testimonial use of that diagnosis, see *State v. Southard*, 347 Or 127, 218 P3d 104 (2009).

[9] OEC 403 provides:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence."

delayed reporting is common in verified cases of child sexual abuse. And, if defendant was of the view that Keltner was embellishing that central thesis in a way that *was* unfairly prejudicial—by suggesting that delayed reporting actually might be an indicator of sexual abuse—then defendant should have made it clear to the court that he was objecting to that embellishment. Defendant did not do that. Again, we reject defendant's claim of error.

■　　　Finally, we turn to defendant's contention that Keltner's opinion testimony given at the OEC 104 hearing was not admissible as scientific evidence. Defendant argues that the state failed to establish that Keltner's delayed disclosure testimony met the standard for admissibility of scientific evidence described in *State v. Brown*, 297 Or at 417, and *State v. O'Key*, 321 Or at 303-05.

There is no real dispute with regard to the underlying premise of defendant's argument—that the testimony was offered as "scientific evidence" and therefore requires a *Brown* foundation to be admissible. Instead, the state acknowledges that *State v. Marrington*, 335 Or 555, 73 P3d 911 (2003), establishes defendant's premise. In *Marrington*, this court held that an expert's testimony that delay in reporting is a "very prevalent characteristic of abused children" would be perceived as scientific evidence by a trier of fact and, as such, must be shown to be scientifically valid before it is admissible. *Id.* at 563-64. In deciding that point, this court focused on the fact that the expert in that case had presented herself as having a scientific background and had claimed that her knowledge was based on science:

> "An expert * * * who has a background in behavioral sciences and who claims that her knowledge is based on studies, research, and the literature in the field, announces to the factfinder that the basis of her testimony is 'scientific,' *i.e.*, is grounded on conclusions that have been reached through application of a scientific method to collected data. Because that is how the factfinder would understand it, a court has a duty to ensure that such information possesses the necessary indices of scientific validity."

*Id.* at 563-64. As our summary of Keltner's testimony in the OEC 104 hearing makes clear, she similarly was presenting

herself as an expert in her field whose knowledge was based, at least in part, on studies, research, and scientific literature. Consequently, her testimony regarding delayed disclosure is scientific evidence and must comply with the standard described in *Brown* and *O'Key* for admission of such evidence.

Under *Brown* and *O'Key*, scientific evidence is admissible if it is relevant under OEC 401,[10] helpful to the trier of fact under OEC 702,[11] and not subject to exclusion under OEC 403.[12] *Brown*, 297 Or at 409; *O'Key*, 321 Or at 297-99. Underpinning the entire admissibility analysis, however, is the requirement that the evidence be shown to be scientifically valid. *See Marcum v. Adventist Health System / West*, 345 Or 237, 245, 193 P3d 1 (2008) (so holding); *O'Key*, 321 Or at 301 n 19 ("scientific validity [is] the linchpin of admissibility"). To determine that issue, and depending on the nature of the evidence in question, a court may be required to consider a number of factors, including:

"(1)   The technique's general acceptance in the field;

"(2)   The expert's qualifications and stature;

"(3)   The use which has been made of the technique;

"(4)   The potential rate of error;

"(5)   The existence of specialized literature;

"(6)   The novelty of the invention; and

"(7)   The extent to which the technique relies on the subjective interpretation of the expert."

*Brown*, 297 Or at 417.[13]

---

[10] OEC 401 is set out above, 347 Or at 116 n 5.

[11] OEC 702 is set out above, 347 Or at 116 n 6. Generally, scientific evidence will assist the trier of fact if it is scientifically valid and properly can be applied to the facts at issue.

[12] OEC 403 is set out above, 347 Or at 119 n 9.

[13] As noted, those factors for analyzing scientific validity initially were set out in *Brown*. This court expanded on them in *O'Key*, adopting, as "an appropriate further development," the logic and a slightly different formulation of the factors articulated by the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals*, 509 US 579, 113 S Ct 2786, 125 L Ed 2d 469 (1993). *O'Key*, 321 Or at 306. For the purposes of our analysis in this case, the distinction between the two sets of standards is not significant.

■ In considering the question of scientific validity (which generally is resolved as a preliminary fact question in an OEC 104 hearing, as it was in this case), courts must bear in mind that the foregoing factors are not exclusive and are not to be used as a mechanical checklist requiring an affirmative finding with respect to each factor. *O'Key*, 321 Or at 300. Whatever factors may be relevant in a particular case, the party offering the scientific evidence at issue (in the present case, the state) has the burden of establishing that it is scientifically valid.

Before applying the multifactor test to the evidence in question, it is important to restate the purpose for which the scientific evidence was offered. As we already have noted, the core of Keltner's testimony was her assertion that delayed reporting often occurs in children who verifiably have been sexually abused. Defendant had signaled his intention to defend on the theory that the victim was fabricating and that her delay in reporting was evidence of that fabrication. As we have explained, the most obvious (and permissible) function of Keltner's testimony was to contradict defendant's claim that delay in reporting demonstrated fabrication.

■ Turning to defendant's arguments under the multifactor test, the state argues that defendant did not preserve his present "scientific foundation" argument in its entirety because, in the OEC 104 hearing, he addressed only two of the five *Brown* factors—the "potential rate of error" and the existence of a "specialized literature"—on which he now relies. The state asserts that, because defendant did not alert the trial court that he had concerns about the sufficiency of the state's scientific foundational evidence with regard to other factors, we should not consider those factors in our *Brown* analysis.

In general, we agree with the premise of the state's argument: In multifactor foundation cases like the present one, for example, the trial court reasonably might assume that some factors are not in dispute if no one mentioned them. However, we think that defendant's arguments in this case were not as the state perceives. When considered in the context of defense counsel's cross-examination of Keltner at

the OEC 104 hearing, we think that defendant's arguments at least should have alerted the trial court that two other *Brown* factors—the "general acceptance of [the technique] in the field" and "use which has been made of the theory"—were implicated. That is as far, however, as the arguments that defendant made fairly may be said to reach.[14] We turn, then, to the relevant *Brown* factors. In assessing those factors, we rely on the evidence presented at the OEC 104 hearing.[15]

• *General Acceptance in the Field.* We note at the outset that Keltner's credentials as an expert are unchallenged, and her qualification to give scientific evidence in her field is unassailable. Instead, we focus on the narrower issue whether her testimony concerning delayed reporting was itself scientific. The first factor that we consider is "the theory's general acceptance in the field." Keltner testified that the phenomenon of delayed reporting in sexually abused children was a "fairly well understood topic" and that "the idea that when children report abuse * * * that [it] * * * is a process and not a single event * * * is well understood." From that testimony by that witness, the trial judge could conclude that there was general agreement in the field that delayed reporting by a child was not inconsistent with the child's having been sexually abused. That criterion—to the extent it was applicable—was met.

• *The Use Which Has Been Made of the Technique.* As we have discussed, we assess Keltner's testimony on the assumption that it was relevant to show that experts in the field would not necessarily regard the evidence of delayed reporting as proving that the victim *had not* been abused. So

---

[14] Of course, the trial court was free to address all the *Brown* factors if it wished to do so. We merely observe here that, where a trial court has ruled that certain evidence is admissible as "scientific evidence," a party ordinarily may not predicate a claim of reversible error on the court's failure to address one or more criteria that the party did not argue.

[15] In *O'Key*, this court indicated that its assessment of the factors would be based on the "scientific testimony and evidence given at the * * * hearing in the trial court, pertinent legal and medical literature on the subject received in evidence at that hearing, and numerous other sources in the area." 321 Or at 308-09. In the present case, the prosecution (which, as the proponent of Keltner's delayed disclosure testimony, bore the burden of demonstrating its scientific validity) did not submit any literature or other documentation, but relied entirely on Keltner's presentation.

understood, Keltner's testimony was not really about a "technique" or its "use." This criterion thus is inapposite in the context of this case.

■ • *The Potential Rate of Error.* This criterion has limited utility in the context of this case for two reasons: First, as already noted, controlled studies are not possible. *See* 347 Or at 114 n 3. Lack of controlled studies is not, in any event, an absolute bar to the admission of expert testimony by qualified clinicians, which was the kind of testimony Keltner gave. *See Marcum*, 345 Or at 252 (so stating); *Jennings v. Baxter Healthcare Corp.*, 331 Or 285, 305-06, 14 P3d 596 (2000) (so holding respecting differential diagnosis by treating physician). That means that other factors must play a more significant role. Second, given the permissible use of the evidence to counter defendant's factual theory about delayed reporting, a "rate of error" in that respect is difficult to postulate.

Even assuming, however, that numbers are relevant, Keltner gave evidence respecting numbers. She repeatedly stated that sexually abused children commonly delay in reporting, but further acknowledged that "a small percentage * * * report immediately."[16] She also acknowledged that there were studies that show that children sometimes lie, but she then stated that "the thing they're most likely to lie about is that abuse did not occur rather than lying falsely about abuse occurring." Keltner did not identify the "studies" to which she referred and did not offer any statistical analysis of the prevalence of delayed *false* accusations. Defendant, for his part, did not ask for verification or challenge her assertion, as an expert, that such studies existed. As noted, however, Keltner did agree with defense counsel, on cross-examination, that there was no way to distinguish a false delayed report from a true delayed report, in the absence of physical evidence or other corroboration.

The state contends that Keltner's acknowledgment in no way detracts from the thrust of Keltner's testimony that delayed disclosure is not a factor that would lead a professional to *rule out* the possibility that a child had been molested sexually. The state notes that Keltner's narrow

---

[16] Keltner explained that such immediate disclosures occurred "particularly with younger kids where it's an accidental disclosure, where they really don't have the capability to keep it a secret."

assertion is entirely verifiable and, in fact, *has* been verified by the "Sorenson and Snow" study that Keltner mentioned (and which, according to Keltner, found that, out of a group of "confirmed" victims of sexual abuse, 72 percent delayed in disclosing). We agree with the state. Keltner's assertions were admissible for the purpose that the state describes, and the trial court did not err in so ruling.

• *The Existence of a Specialized Literature.* At the OEC 104 hearing, Keltner responded affirmatively when the prosecutor asked if there has been specialized, peer reviewed literature devoted to the issue of delayed disclosure. She testified that

"what the literature looks like if you're looking at national studies, for example, there was one by—done by Sorenson and Snow in the early '90s, but really well done, and I continue to use it as a reference. They found that 72 percent of the children that they evaluated initially denied abuse.

"And since that time, others have spent more studies actually looking at adults who are known to have been abused as children or raped as children, and again, what you find is even adults looking back at their abuse as children, that very large percentages never reported, never disclosed it, and that those that do disclose tend to delay in their disclosure."

Keltner later clarified that the Sorenson and Snow study looked at cases that were confirmed by means of an abnormal physical examination, perpetrator confession, or perpetrator conviction, and that it looked at both delayed disclosures and initial denials. The factors of abnormal physical examination, perpetrator confession, and perpetrator conviction were used as objective verifiers in the study. Keltner obviously assumed that the study paralleled the situation in cases that lacked those objective verifiers, and defendant does not argue even now that the study was irrelevant because, for example, the present case involves neither an abnormal physical examination nor a confession.[17] Keltner also referred to "studies" and "the literature" in various other contexts, but

---

[17] Keltner also described a small, informal CARES study of children with abnormal physical examinations, which found that 90 percent of those children had delayed in disclosing sexual abuse. She acknowledged that the study was not peer reviewed and was not rigorous. We do not consider it as part of the state's portrayal of specialized literature at the OEC 104 hearing.

was not asked to provide more detail. Keltner's testimony on the point thus was scanty, but it was sufficient to permit the trial judge to be satisfied that this criterion had been met.

• *Other Factors. Brown* refers to two additional factors—the novelty of the technique and the "extent to which the technique relies on the subjective interpretation of the expert." *Brown*, 297 Or at 417. Keltner was not cross-examined about those factors, and defendant does not attempt to make a separate issue respecting either or both of them here. Even were he to do so, however, the trial court was entitled to find from Keltner's testimony that the state's particular use of the phenomenon of delayed reporting was not unduly novel and did not rely improperly on the subjective interpretation of the expert.

Having completed our consideration of the *Brown* factors as they apply to the state's proffered evidence of the delayed reporting phenomenon presented in the OEC 104 hearing, we conclude that, on the record before it, the trial court was entitled to determine that Keltner's testimony about the delayed reporting phenomenon survived the objections to it that were made at that hearing, subject to qualifications that defendant did not later choose to raise at trial. There was no reversible error.

The decision of the Court of Appeals and the judgment of the circuit court are affirmed.