Argued and submitted September 11, 2019, reversed and remanded
March 31, 2021

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

LARRY MARSHALL BOLTON,
*Defendant-Appellant.*

Marion County Circuit Court 15CR16809;
A163568 (Control), A163569

484 P3d 347

Defendant appeals from a judgment of conviction for 17 offenses involving the abuse of his wife. He primarily assigns error to the trial court's admission, without a foundation for scientific evidence, of the expert testimony of the state's witness about the counterintuitive behaviors of victims. The state contends, in a cross-assignment of error, that the trial court erred in determining that the state had not provided an adequate foundation for scientific evidence. *Held*: As to defendant's assignment of error, the expert testimony required a scientific foundation, and the trial court erred in admitting the evidence as nonscientific expert testimony. As to the state's cross-assignment of error, the trial court did not err in finding that the foundation that was laid was insufficient for scientific evidence, and that insufficiency is not remedied by scholarly articles offered on appeal.

Reversed and remanded.

Sean E. Armstrong, Judge.

Daniel C. Bennett, Deputy Public Defender, argued the cause for appellant. Also on the opening brief and a supplemental brief was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services. Larry Marshall Bolton filed a supplemental brief *pro se.*

Jordan R. Silk, Assistant Attorney General, argued the cause for respondent. Also on the briefs were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Lagesen, Presiding Judge, and DeVore, Judge, and Powers, Judge.

DeVORE, J.

Reversed and remanded.

DeVORE, J.,

In this criminal case, both defendant and the state assign error after the trial court entered a judgment that convicted defendant of 17 offenses involving his wife, J.[1] We address defendant's leading assignment of error and the state's related cross-assignment of error. Defendant argues that the trial court erred when, without a foundation for scientific evidence, the court admitted the expert testimony of the state's witness about the counterintuitive behaviors of victims. In a cross-assignment, the state contends that the trial court erred in determining that the state had not provided an adequate foundation for scientific evidence. The state argues, offering scholarly literature on appeal, that the foundation was sufficient for the nature of the testimony under the standards of *State v. Brown*, 297 Or 404, 687 P2d 751 (1984), and *State v. O'Key*, 321 Or 285, 899 P2d 663 (1995).

We conclude that the expert testimony required a scientific foundation; that the trial court erred in admitting the testimony as nonscientific expert testimony; that the trial court did not err in finding the foundation that was laid was insufficient for scientific evidence; and that the insufficiency is not remedied by scholarly articles offered on appeal. We reverse and remand.

Before returning to those issues, we reject several other assignments of error at the outset. Defendant argues that the trial court plainly erred in admitting Exhibit 2, a diagram, called a "power and control wheel," that depicts behavior in which domestic abusers engage. Defendant argues that the exhibit required a scientific foundation. He failed to preserve the issue by objecting to its admission. *See* ORAP 5.45(1) (requiring preservation of error).

---

[1] Defendant was convicted of one count of first-degree sexual abuse, ORS 163.427; one count of first-degree sodomy, ORS 163.405; one count of first-degree unlawful sexual penetration, ORS 163.411; one count of menacing constituting domestic violence, ORS 163.190; one count of second-degree assault constituting domestic violence, ORS 163.175; one count of fourth-degree assault constituting domestic violence, ORS 163.160(3); two counts of fourth-degree assault, ORS 163.160; one count of strangulation, ORS 163.187; one count of recklessly endangering another person, ORS 163.195; one count of interference with making a report, ORS 165.572; and six counts of coercion, ORS 163.275.

Defendant also argues that the trial court plainly erred under the Sixth and Fourteenth Amendments to the United States Constitution by instructing the jury that it could return a verdict of guilty without a unanimous agreement of the jurors. Defendant did not object to the instruction, and there was no jury poll. Because defendant did not preserve this issue, we decline to exercise discretion to consider it. *See State v. Dilallo*, 367 Or 340, 478 P3d 509 (2020) (declining to consider unpreserved error in this context).

In a *pro se* supplemental brief, defendant assigns error to the trial court's ruling excluding evidence of various prior accusations that the victim made against others. The trial court determined that the probative value of that extrinsic evidence was substantially outweighed by the risk of prejudice from confusion of issues under OEC 403. We conclude that the trial court did not abuse its discretion in making its determination. *See State v. Baughman*, 361 Or 386, 406, 393 P3d 1132 (2017) (reciting standard). We reject the assignment of error without further discussion.

We review the trial court's determination that evidence is not scientific for legal error. *Brenner v. Nooth*, 283 Or App 868, 877, 391 P3d 947, *rev den*, 361 Or 671 (2017). To provide context for the issues addressed, we summarize the facts.

In 2011, defendant was 51 years old and J was 24 years old. J moved into defendant's home when recovering from drug addiction and escaping a prior abusive relationship. She was underweight, tired, and scared. Soon after she moved in, while both were in a hot tub, he pulled her pants off. She got out. At a party, he held her over a couch and painfully spanked her. Someone called the police. She left with them and spent the night in a shelter. She was not attracted to defendant. About 10 days after her arrival, defendant engaged in forcible intercourse over her objection. When drunk, he spanked her, sometimes several times a week. He assaulted her a number of times, causing a bloody nose or holding her off the ground by the throat, saying he could kill her. On one occasion and over her objection, he held J down while a woman performed oral sex on her. At

one point, J's aunt took her away, but J returned to defendant's home.

Defendant told J they should marry, and, in December 2011, they did, although without her friends or family in attendance. In March 2012, police spoke with J, while investigating another matter. She told them of defendant's abuse, but she did not want to press charges. She left with the police for a shelter. Defendant called repeatedly and threatened her if she did not return. She did.

In the summer of 2013, defendant grew angry over a torn shirt, threw J to the floor, pulled her hair, and slammed her head into the ground repeatedly. That year, she became pregnant.

After an argument, J prepared to leave to stay with her sister, and defendant attacked her. She left, but, after four or five days, J returned to defendant's home.

Sometime after the baby was born, J decided to leave. She secretly saved money and recorded defendant's abusive language. In February 2015, J and her daughter left for a shelter and obtained a restraining order.

Defendant was charged with 21 offenses for conduct involving J. Defendant's theory of the case was that J had fabricated her account of his actions. He intended to argue that her behavior, including failing to contact police and remaining with him, was evidence that her testimony was untruthful.

Anticipating that defense, the state filed a pretrial motion to admit expert testimony regarding, among other things, counterintuitive victim behavior. The motion explained that counterintuitive victim behavior includes

> "denial of abuse; recanting, minimizing, or changing the statement about what happened; not leaving the abusive relationship; returning to the abusive relationship after leaving; resuming contact with the perpetrator including sexual intimacy; not disclosing the abuse immediately; covering for the perpetrator; and not cooperating with the criminal justice system."

In its motion, the state wrote:

"The State acknowledges that inasmuch as expert testimony regarding Domestic Violence dynamics and counterintuitive victim behavior is offered as psychological or scientific phenomenon (as was the case in *Marrington* and *Perry*) it would likely have to qualify under the standards set forth in *Brown/O'Key*."

However, the state insisted that, where the expert testimony is "narrow in scope," the testimony "should not be subject to *Brown/O'Key* scrutiny."

In a pretrial hearing, the state offered the expert testimony of Downing, the executive director of the Center for Hope and Safety in Marion County, which is a nonprofit agency that serves the victims of domestic violence, sexual assaults, stalking, and human trafficking. Downing testified that she has a bachelor's degree with double majors in psychology and women's studies. She testified that she was certified by the state as a victim services specialist and has had "thousands of hours of training," including in "trauma informed services for victims." At the hearing, she offered testimony about the myths of domestic violence: that the violence is provoked, that domestic violence is confined to low income people, that victims "just leave [the] abuse," that a victim would not return to an abuser, that a person would report abuse "right away" if abused, and that a victim is safer after reporting abuse. In effect, she offered to testify that the behavior that defendant would attribute to J as inconsistent with having been abused is common among domestic violence victims and not necessarily reason to distrust the victim's testimony.

At the hearing, defendant objected to the admission of Downing's testimony, arguing, among other things, that her testimony was based in behavioral science, that it should require a scientific foundation, and that her education was insufficient to be an expert at all. Defendant contended that the subject was not complex and domestic violence was common, such that the testimony would not be helpful because it is not beyond the experience of the jurors. The state responded that the testimony was "not scientific evidence" and was instead "expert testimony based on decades of experience working in domestic violence."

The trial court noted that Downing lacked an advanced degree and that her testimony would not be "admissible as scientific evidence." That determination becomes the basis of the state's cross-assignment of error. The court determined, however, that Downing qualified as a nonscientific expert based on her experience and that her specialized knowledge would be helpful to the jury within the meaning of OEC 702.

At trial, Downing testified that she has worked directly with thousands of victims of domestic violence for over 25 years. As before, she described her college studies:

"[PROSECUTOR:]   Can you tell us what your educational background is[?]

"[DOWNING:] So I have a bachelor's degree from Willamette University. I double majored in psychology and women's studies. I've also taken graduate level courses in different subjects and have had thousands of hours in training on—specific to domestic violence, sexual assault, stalking and human trafficking.

"* * * * *

"[PROSECUTOR:]   And did those trainings cover specific issues, for example, with regard to dynamics of domestic violence?

"[DOWNING:]   It did."

Downing added that, in addition to receiving training on domestic violence, she has regularly trained other people, lectured, and testified as an expert on the subject:

"[PROSECUTOR:]   Do you also conduct these trainings?

"[DOWNING:]   I do.

"[PROSECUTOR:]   And can you tell us a little bit about that?

"[DOWNING:]   So I have trained over 30,000 people all across the northwest on domestic violence, sexual assault, stalking and human trafficking. I train for the State Victims Academy and I'm also—I've trained for numerous academies. I've also guest lectured in universities and colleges around the state.

"[PROSECUTOR:]   Okay. Have you also testified previously in circuit courts in Marion County and been qualified as an expert witness regarding issues of domestic violence?

"[DOWNING:]   Yes, I have been."

Turning to the merits, Downing spoke about the "common misconceptions" surrounding domestic violence. She described the misconceptions that a victim somehow provoked the violence, that a victim "can just leave [the] abuse," that it is safer to report, that a "victim would report right away," and that a victim would not go back to the abuser. When asked about "the phrase 'counterintuitive victim behaviors,'" Downing testified that she was familiar with it. She explained that the phrase refers to a set of common victim behaviors that defy the general public's expectation for how a domestic violence victim would react to abuse. Downing explained that the general public is often unaware of how victims behave and that, in her experience, people are often "shocked" when they learn about the dynamics of domestic violence.

Downing described her own personal experience with the counterintuitive behaviors in which victims engage. Among them are denying that abuse is happening, recanting or minimizing reports of abuse, covering up for a perpetrator, blaming oneself for abuse, being ashamed to admit being abused, not leaving the abusive relationship, returning to the abusive relationship, and resuming sexual intimacy. On occasion, Downing couched her testimony in terms of the greater national study of domestic violence. In one instance, Downing referenced national and statewide observations regarding the particular danger a victim faces when trying to escape an abusive relationship:

"[DOWNING:]   And the most dangerous time, we've found overall—and this is nationally—is that when someone is leaving an abuser or has left. We've had, unfortunately, more than 250 individuals—women and children murdered due to domestic violence in the state of Oregon in the last few years.

"And the vast majority of them were already out of the relationship. One had been out of for a year and—or were in the process of getting out."

In another instance, Downing commented while describing Exhibit 2—a diagram called a power and control wheel that depicts common abusive behaviors—that "across the nation many programs" use the wheel to educate victims.

In its rebuttal argument on closing, the state referred to Downing's testimony about the myths of domestic violence based on "her decades of experience." The state recounted the myths that a victim would report abuse, would never again be sexually intimate, and would leave the relationship. The state argued that J's "behavior, while difficult for you to understand it, is very common."

The jury convicted defendant on 17 of the offenses charged.

On appeal, defendant assigns error to the trial court's ruling that Downing's testimony was admissible as nonscientific evidence. He argues that, after his trial, a new decision, *State v. Henley*, 363 Or 284, 422 P3d 217 (2018), made clear that testimony like Downing's testimony was scientific evidence that required a scientific foundation.

Under Oregon law, scientific, technical, or other specialized knowledge may be admissible when it will assist the trier of fact to determine a fact at issue. OEC 702.[2] Scientific evidence is admissible only upon a showing of scientific validity employing the multifactor analysis developed in *Brown*, 297 Or at 417, and *O'Key*, 321 Or at 299-300. The Supreme Court has not "precisely defined what makes evidence 'scientific,'" *State v. Marrington*, 335 Or 555, 561, 73 P3d 911 (2003), and that uncertainty explains the problem presented when a proponent offers nonscientific expert testimony that the opponent insists *is* scientific testimony. The recent *Henley* decision summarized the characteristics of scientific evidence this way:

> "Expert evidence is 'scientific' under OEC 702 when it is expressly presented to the jury as scientifically grounded,

---

[2] OEC 702 provides:

"If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise."

as in *Marrington*. Expert evidence also is 'scientific' under OEC 702 when it 'draws its convincing force from some principle of science,' as in *Brown*, * * * or 'implies a grounding in the methods and procedures of science' and would likely be perceived by the jury as imbued with the 'persuasive appeal of science,' [as in] *O'Key*."

*Henley*, 363 Or at 301 (internal citations omitted). After *Brown* and *O'Key*, four cases illustrated the meaning of "scientific" evidence. Those cases are helpful.

The decision in *Marrington* demonstrated that the *Brown/O'Key* standard for scientific evidence reached beyond "hard sciences" to include the behavioral sciences. *Marrington,* 335 Or at 561. The court considered whether a scientific foundation was required for the testimony of a program manager from Family Friends, a service organization that interviewed and treated victims of child abuse. *Id.* at 558-60. The witness had bachelor's and master's degrees in psychology, was certified by the state as a counselor, had worked for the organization for 12 years, and was current with the literature and research in child abuse. *Id.* at 558. She testified that a child's delay in reporting sexual abuse is a predominant feature of abuse. *Id.* at 559. More carefully, she said, "[D]elayed reporting is never used to prove a molest but it holds up against the myths of what an adult might expect." *Id.* at 559.

On review, the Supreme Court recognized "that expert testimony concerning matters within the sphere of the behavioral sciences possess the increased potential to influence the trier of fact as scientific assertions, just as expert testimony dealing with the 'hard' sciences does." *Id.* at 561. The court considered that the witness was licensed by the state, professed to provide training for others about sexual abuse, had interviewed 200 children, and referred to research and literature in her testimony. *Id.* at 563. Absent a scientific foundation, albeit one suitable for the behavioral sciences, the testimony was found inadmissible. *Id.* at 564. The judgment of conviction for first-degree sexual abuse was reversed and remanded. *Id.* at 566.

In *State v. Perry*, 347 Or 110, 218 P3d 95 (2009), the court affirmed a judgment on various crimes involving

sexual abuse of a child, upholding the admission of testimony about the phenomenon of a child's delayed reporting of sexual abuse. The state's witness was the medical director of CARES Northwest, who held an M.D. and Ph.D. in biometry. She testified that the medical profession recognizes a medical diagnosis of child sexual abuse; that there are specialized journals and other peer reviewed literature on child sexual abuse; but that the field cannot ethically conduct scientifically case-controlled research in child sexual abuse, as in "the majority of medical processes." *Id.* at 113-14. The witness testified that delayed reporting was "common," was "well understood," and was considered in a body of literature. *Id.* at 114. She cautioned that delayed reporting was not affirmatively probative of whether sexual abuse actually occurred. *Id.* at 117. After laying a foundation, the state offered the testimony *as scientific evidence. Id.* at 120.

On review, the Supreme Court considered the particular *Brown/O'Key* factors that were made applicable by the defendant's objection and that were suited to behavioral science. *Id.* at 121-26. Given the foundation provided, the court concluded that the trial court did not err in admitting the testimony. *Id.* at 126.

A different result occurred in the recent *Henley* decision, where, as here, the state did not offer such testimony as scientific evidence in the trial court. 363 Or at 290. The defendant was convicted of first-degree sexual abuse and attempted first-degree sodomy of his stepdaughter. *Id.* at 286. The state offered the testimony of a forensic examiner for Children at Risk Evaluation Services from Boise, who had interviewed the victim. *Id.* at 288. The witness had a bachelor's and a master's degree in social work, had received training in forensic interviewing, had 10 years' experience, and had done over 600 forensic interviews. *Id.* at 289. The state offered her testimony about a perpetrator's behavior in "grooming" a victim to desensitize the victim to familiarity, build trust, and weaken the child's defenses. *Id.* at 290-91. She opined that the defendant's acts of providing the stepdaughter massages of her neck and chest could be considered grooming. *Id.* at 292. The prosecutor elicited that the witness was not a psychologist, and the

prosecutor told the trial court that he was not asking for a scientific opinion. *Id*. at 290-91.

On review, the Supreme Court recognized that the witness did not purport to establish that sexual grooming had been studied by social scientists or that her observations about grooming had been scientifically verified phenomena. *Id*. at 300. The court noted that the prosecution had "disclaimed that he was asking her for a scientific opinion." *Id*. The state argued that the witness gave "limited testimony that did not make any 'scientific assertion' to the jury." *Id*. at 301.

The state's attempt to characterize the testimony as nonscientific proved to be unavailing. The Supreme Court rejoined:

> "[T]he fact that the proponent of expert evidence at trial disclaims that the evidence is scientifically grounded does not obviate the possibility that it nevertheless constitutes 'scientific' evidence under OEC 702."

*Id*. The court determined that the witness was presented as an expert in child sexual abuse. She had college degrees, certification, specialized training in forensic interviewing, and ten years' experience with 600 children. She opined on grooming as a predicate to sexual abuse and identified the defendant's massages as grooming behavior. *Id*. Although the prosecutor did not highlight the scientific nature of her testimony, nor focus on research, studies, or literature, the court determined that "lay jurors likely would have accorded the testimony the persuasive value of scientific principle." *Id*. at 303. The court concluded that the testimony about grooming was scientific, lacked an appropriate foundation, and was inadmissible. *Id*. at 304.

Recently, in *State v. Evensen*, 298 Or App 294, 296, 447 P3d 23, *rev den*, 366 Or 64 (2019), we determined to be admissible a detective's testimony about the comparative suggestibility of children depending upon their age. The detective had interviewed the 12-year-old victim. The detective testified about the victim's account that the defendant had touched her sexually. As background, the detective testified that she had five years' experience in such cases and

she followed guidelines to limit suggestibility with children. When asked the age range during which suggestibility was concerning, the detective answered "[m]ostly in the three to four age group" while with "the five and six year old range, you see a little bit more of them correcting you if you say something wrong ***." *Id*. at 311. The defendant objected that the testimony lacked the scientific foundation required by *Brown/O'Key* standards. *Id*. The objection was overruled. *Id*. The detective explained that, in her training and experience, the interviews of three- and four-year-old children were more "concerning than older kids" and that she would send younger ones to be interviewed by a specialist. *Id*. at 311-12.

On appeal, we noted that the detective did not mention familiarity with any literature or studies supporting her views, *id*. at 312, and she did not purport to draw any scientific or research-based connection between her challenged testimony and the conduct of the defendant or the victim, *id*. at 316. We distinguished *Henley* and another recent case, *State v. Plueard*, 296 Or App 580, 439 P3d 556, *adh'd to as modified on recons*, 297 Or App 592, 443 P3d 1195 (2019). In those cases, the witnesses addressed grooming, which was a concept or phenomenon that was not common knowledge and that implied it was scientifically based. *Evensen*, 298 Or App at 314-16. The detective in *Evensen*, however, did not address any "'phenomenon'" from studies of behavioral science. *Id*. at 316 (quoting *Henley*, 363 Or at 289). She only spoke from experience that interviews of older children are less "concerning." *Id*. We held the narrow testimony limited to her background to be admissible. *Id*.

Like *Henley* and *Marrington*, we conclude that Downing's testimony in this case was scientific evidence. First, the state presented her as an expert in domestic violence based on education and training. Her undergraduate work in psychology and women's studies was followed by "thousands of hours of training," including in "trauma informed services for victims." She is certified by the state as a victim services specialist and has over 25 years of experience working with thousands of victims. She teaches about domestic violence, guest-lectures on the subject at colleges and universities, and has trained over 30,000 people in the Northwest.

Second, Downing made small but unmistakable reference to presumably professional sources of information in the field of human behavior. She observed that "the most dangerous time, we've found overall—and this is nationally— is \*\*\* when someone is leaving an abuser or has left." Her observation that "we" have observed a pattern "nationally" alludes to a broader study of domestic violence beyond her own experience. She made a similar allusion when saying that "across the nation many programs" use the power and control wheel to educate victims about common patterns in domestic violence. In applying *Henley*, we have determined that this sort of phrasing "evoke[s] \*\*\* a kind of scientific air" which implies a scientific basis because it "suggests the existence of a recognized pattern of conduct that has been determined to have particular significance." *Plueard*, 296 Or App at 588. With such references, Downing conveyed to the jury an expertise that was grounded in behavioral science.

Third, Downing was asked to describe a phenomenon or concept of "counterintuitive victim behavior." Like grooming in *Henley* or *Plueard*, it was presented as a phenomenon or concept that "was not common knowledge." *Henley*, 363 Or at 304. Downing testified that the general public is often "shocked" to learn of many of the behaviors that she identified. As such, the phenomenon of "counterintuitive victim behavior" implied a basis in behavioral science. *See id*. at 301-04.

Finally, the authority that Downing conveyed was manifested in the breadth of the opinions that she offered on matters of human behavior beyond common understanding. Her opinions described a variety of counterintuitive victim behaviors. Those opinions were not, as in *Marrington*, limited to just the single phenomenon of delayed reporting, but spanned the range of counterintuitive victim behaviors from denial of abuse to return to the abuser.

Although the state tried to present Downing's testimony at trial as "narrowed," or as founded on her experience rather than in behavioral science, the state's characterization of the testimony is not determinative. The same attempt failed in *Henley* when a narrower opinion was offered. As

previously noted, to disclaim "that the evidence is scientifically grounded does not obviate the possibility that it nevertheless constitutes 'scientific' evidence under OEC 702." *Henley*, 363 Or at 301.

We conclude that Downing's testimony about counterintuitive victim behavior was "scientific" evidence within the meaning of OEC 702. As a result, the trial court erred in permitting the testimony as purportedly expert nonscientific testimony in the absence of an appropriate scientific foundation suitable to behavioral science. *See generally Perry*, 347 Or at 121-26 (discussing an appropriate foundation for behavioral science).

In its cross-assignment of error, the state contends that, even if Downing's testimony was scientific testimony, the trial court erred in ruling that the evidence was insufficient to provide a foundation for scientific testimony. The state invites us to determine, based on Downing's experience and the secondary literature that the state cites in its brief, that Downing's testimony should be admissible under the multifactor test of *Brown* and *O'Key*. *See State v. Branch*, 243 Or App 309, 314, 259 P3d 103, *rev den*, 351 Or 216 (2011) (explaining that, in determining whether evidence is scientifically valid, we may consider scientific literature both outside of the record and presented for the first time on appeal).

As an initial matter, we decline the state's invitation to supplement the record with scholarly writings referenced in the state's brief. The Supreme Court declined the same invitation in *Henley*. In that case, the state requested judicial notice and asked that the court determine that the concept of sexual grooming possesses a level of scientific validity sufficient to be admissible under OEC 702. 363 Or at 304-06. The state cited articles and other research materials, including those in the defendant's own briefing. *Id.* at 305. The Supreme Court declined. It explained:

> "To decide the matter of scientific validity and reliability for the first time on review, we would be required to decide based on judicial notice of legislative facts—that is, nonadjudicative facts—used to determine the foundational basis for admission of evidence."

*Id.* The court declined to do so because the parties had not been given a full opportunity to adduce the evidence before the trial court, and because the court was uncertain whether it had been advised of the full scope and nature of the research on sexual grooming of children. *Id.* The court would not determine on appeal what should have been determined in the trial court in the first instance.

Similarly, we decline to supplement the record with new material offered on appeal. That is particularly so due to the way in which the state chose to present Downing's testimony at the outset. In the pretrial hearing, defendant's initial objection was that notice had been too short and time too short to have prepared to address testimony if the state offered it as scientific testimony under the *Brown/O'Key* standards. The state responded by characterizing Downing's testimony as nonscientific testimony. Given that approach, the parties became concerned with whether Downing's testimony was expert, not whether it was scientifically valid. It is doubtful that defendant had an opportunity to adduce evidence contrary to a scientific foundation for Downing's testimony—particularly when the state disclaimed the evidence was scientific. Although the state hedged, saying that it could argue that the testimony *was* valid under *Brown/O'Key* standards, the state offered the testimony as *nonscientific* testimony. Because the state took that position, the parties did not directly address *Brown/O'Key* standards, and defendant was not on notice of a need to address those standards. *See Perry*, 347 Or at 121-26 (reviewing standards in light of objections raised). The record was not developed below to fairly present a question whether the testimony could have a valid scientific foundation.

Moreover, we are unsure, as was the court in *Henley*, whether the secondary references offered in the state's brief serve to fully advise us of the scope of research into the various behavior of domestic violence victims. During her pretrial testimony, Downing allowed that research has shown that all victims are different and that it is a myth that one can reliably predict how a victim will react in any given situation.

Unlike *Marrington*, *Perry*, or *Henley*, the trial court here did indicate, albeit somewhat incidentally, that the record did not suffice to support Downing's testimony as scientific evidence. The state contends that Downing's 25 years' experience with thousands of victims of domestic violence should suffice to permit her to provide scientific testimony about victims' counterintuitive behavior. Defendant responds that the state addresses one factor among the *Brown*/*O'Key* standards—the expert's education and training—but little else. *See Brown*, 297 Or at 417 (qualifications as one of seven factors); *see also O'Key*, 321 Or at 303-04 (listing four additional factors). Defendant has the better argument.

Because the state presented Downing's testimony in the trial court as nonscientific, the state did little or nothing to provide a scientific foundation for Downing's opinions on counterintuitive victim behavior. The record is quite unlike the foundation laid in *Perry* where the doctor's narrow opinion about delayed reporting was couched in terms of specialized training, professional journals, and peer-reviewed literature. 347 Or at 113-14. The record here does not address general acceptance in the field of Downing's opinions on the patterns of behavior for abusers and victims, the existence of specialized literature in the field, the extent to which her opinions rely on subjective interpretations, the variation or consistency of opinions on the characteristic behavior of abusers and victims, or the general acceptance of those views in the professional literature in the field. *See Brown*, 297 Or at 417 (factors); *O'Key*, 321 Or at 303-04 (factors); *see also State v. Southard*, 347 Or 127, 133-34, 218 P3d 104 (2009) (not all factors will apply). In short, the trial court did not err in determining that Downing's testimony would not be admissible as scientific evidence based on the limited foundation provided.

As in *Henley*, 363 Or at 286, and in *Marrington*, 335 Or at 566, the error in admitting Downing's testimony as nonscientific was not harmless. The judgment of conviction must be reversed and remanded.

Reversed and remanded.