Argued and submitted July 31, 2014, conviction for second-degree disorderly conduct reversed, otherwise affirmed June 3, 2015

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

DAVID LEE LOVE,
*Defendant-Appellant.*

Curry County Circuit Court
12CR0197; A151941

351 P3d 780

Sarah Laidlaw, Deputy Public Defender, argued the cause for appellant. With her on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Jeff J. Payne, Assistant Attorney General, argued the cause for respondent. With him on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before DeVore, Presiding Judge, and Ortega, Judge, and Garrett, Judge.*

---

* Ortega, J., *vice* Haselton, C. J.

GARRETT, J.

**GARRETT, J.**

The owner of a mobile home, his three roommates, and an invited guest were involved in a physical confrontation that resulted in police and an ambulance being summoned. The fight was confined to the interior of the mobile home and involved only the five people present. Defendant, one of the roommates, was convicted of second-degree disorderly conduct, ORS 166.025(1), and harassment, ORS 166.065(3). The trial court sentenced defendant to 24 months of bench probation and ordered him to pay restitution. On appeal, defendant argues that trial court should have granted his motion for a judgment of acquittal on the disorderly conduct charge. Defendant also assigns error to the restitution award.

For the reasons explained below, we agree with defendant that the state failed to show that the fight inside a private residence posed a risk of "public inconvenience, annoyance or alarm," as required by the disorderly conduct statute. We therefore reverse defendant's conviction for second-degree disorderly conduct. As to defendant's challenge to the restitution award, we conclude that it is not properly before us in this appeal.

We turn to the facts pertinent to defendant's conviction for disorderly conduct. On the evening at issue, five people gathered in a mobile home owned by Silva. Three of those people—defendant, Mumper, and Rains—were Silva's roommates and had lived in the mobile home for approximately six weeks. A guest, Addison, visited the home that day. The group drank beer and ate dinner. After dinner, defendant and Silva got into a fight. In the commotion that followed, Mumper suffered a broken leg. Silva, Mumper, and Rains testified that defendant started the fight by attacking Silva, that defendant kicked and broke Mumper's leg when she tried to pull defendant off of Silva, and that at one point defendant grabbed and held Rains up by her neck. Defendant testified that Silva started the fight, that Silva was the one who held Rains by the neck, and that defendant never kicked or hurt Mumper in any way.

The exact sequence of events that followed the fight is also unclear. At some point after the fight ended, Silva

called 9-1-1. At about 9:00 p.m., an ambulance arrived and transported Mumper to the hospital. Later, at 11:47 p.m., Deputy Lorentz arrived at Silva's home and spoke to defendant, Silva, and Addison. A few minutes later, Lorentz was called to a different incident and left without making any arrests. About an hour later, someone made a second 9-1-1 call and Lorentz returned to the mobile home. Lorentz interviewed defendant a second time and learned that defendant had attacked Silva because he had been offended by some of Silva's remarks. Lorentz arrested defendant.

Defendant was charged with strangulation (of Rains), fourth-degree assault (of Mumper), harassment (of Silva), and second-degree disorderly conduct. At the close of the state's evidence, defendant moved for a judgment of acquittal on the disorderly conduct charge, arguing that the state had presented no evidence of any risk of public inconvenience, annoyance, or alarm. The state responded that the other residents and guests of the mobile home, and the police officers who responded to the scene, were members of the public who had been inconvenienced, annoyed, and alarmed. The trial court denied defendant's motion. The jury convicted defendant of disorderly conduct and harassment, but was unable to reach a verdict on the strangulation and assault counts. The state elected not to retry defendant on those two counts; the trial court dismissed them on the state's motion. On the remaining counts, defendant was sentenced to 24 months of bench probation.

On appeal, defendant assigns error to the trial court's denial of his motion for a judgment of acquittal, reprising his argument below that the fight posed no risk to the "public."

Defendant's challenge to the sufficiency of the evidence as to the disorderly conduct charge requires us to answer a narrow question: whether, after examining the evidence in the light most favorable to the state, a rational trier of fact could have found that defendant recklessly created a risk of "public inconvenience, annoyance or alarm." *State v. Liston,* 212 Or App 703, 705, 159 P3d 335, *rev den,* 343 Or 206 (2007) (describing our standard for reviewing the denial

of a motion for judgment of acquittal); ORS 166.025 (setting forth elements of disorderly conduct).

To resolve that question, we must construe the meaning of the statutory phrase "public inconvenience, annoyance or alarm." We do so using the familiar framework for statutory interpretation set forth in *PGE v. Bureau of Labor and Industries*, 317 Or 606, 859 P2d 1143 (1993), *as modified by State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009). The goal of statutory interpretation is to determine the intent of the legislature that enacted the statute. *Gaines*, 346 Or at 171. We do so by first considering the statute's text and context. *Id.* First-level contextual analysis includes any prior cases that have interpreted the statute. *State v. Cloutier*, 351 Or 68, 100, 261 P3d 1234 (2011). We next consider any pertinent legislative history. *Gaines*, 346 Or at 172-73. Finally, if the legislature's intent remains unclear, we turn to "general maxims of statutory construction." *Id.* at 172.

Defendant relies on three of our cases for the proposition that, in order to present a risk of "public inconvenience, annoyance or alarm" for purposes of ORS 166.025, a person's conduct must have affected (or risked affecting) "a substantial portion of the community at large." *See State v. Gilbert*, 48 Or App 419, 617 P2d 288 (1980); *State v. Stubblefield*, 42 Or App 201, 600 P2d 469 (1979); *State v. Clark*, 39 Or App 63, 591 P2d 752 (1979). Although those cases do support defendant's position, they were superseded by *State v. Willy*, 155 Or App 279, 963 P2d 739 (1998). In *Willy*, we observed that, rather than following the *PGE* methodology for statutory interpretation (which had not yet been announced), *Clark, Stubblefield,* and *Gilbert* were based on a particular canon of construction. That canon holds that, when "borrowing a statute from another state, the legislature is assumed to adopt the then existing case law interpretation of that statute in the state of origin." *Clark*, 39 Or App at 65. Because ORS 166.025 was derived from a New York statute, those three cases considered "decisions of various New York trial courts." *Willy*, 155 Or App at 284. Based on those New York cases, *Clark, Stubblefield,* and *Gilbert* concluded that "evidence of *actual* inconvenience, annoyance or alarm to a substantial group of people is required to prove disorderly conduct." *Id.* at 283 (emphasis added).

In *Willy*, the defendants were convicted of disorderly conduct based on an incident in which they spent the night shooting at least 125 rounds of ammunition from a parcel of private property owned by the defendants' family. *Id.* at 282. On appeal, the defendants relied on *Clark*, *Stubblefield*, and *Gilbert* to argue that their convictions should be overturned because the state had proved that their conduct had "actually" annoyed or alarmed only two people. *Willy*, 155 Or App at 282. However, we recognized that the methodology employed by those three cases was flawed because they had relied on New York court decisions that were interpreting a "dissimilar" statute. We also reasoned that

> "[t]here is no support in the language of ORS 166.025(1) for [the] holding that the statute requires proof of actual public inconvenience, annoyance or alarm *or that the 'public' nature of inconvenience, annoyance or alarm is determined by reference to the number of persons actually so affected.* And the reasoning supporting their conclusions to the contrary, that is, their reliance on New York trial court decisions construing a dissimilar statute, is plainly incorrect."

*Id.* at 287 (emphasis added).

We then affirmed the defendants' convictions because their conduct had created a *risk* of public inconvenience, annoyance, or alarm. We reached that determination based on several key facts: the shots were fired "across a public roadway and in the direction of a residence"; "[t]he noise was loud and could be heard at least two miles away"; "[m]embers of the public lived well within that range of hearing"; and "[t]wo individuals who heard the shots actually were frightened by the noise." *Id.* at 287. Thus, rather than focusing on how many people were affected by the defendants' conduct, our decision in *Willy* was based on a number of other factors: whether the conduct in question affected public roadways; whether it disturbed neighboring residences; whether it could be heard over a significant distance; and whether that noise might be frightening.

From the above observations, we conclude that, contrary to defendant's argument, *Willy* is inconsistent with the definition of "public" contained in *Clark*, *Stubblefield*, and

*Gilbert.* Under that definition, "public" means "a substantial portion of the community at large." *Willy,* however, clearly disavowed the idea that the "public" nature of a defendant's conduct can be determined by the number of people affected by it. 155 Or App at 287. Moreover, the factors that *Willy* considered to be most important do not suggest that we were concerned only with whether a "substantial portion" of the community was likely to be affected by the defendants' conduct. Thus, *Willy* suggests that the term "public" means something other than a substantial number of people. *Willy* stopped short of actually defining "public," however. That is most likely because the defendants apparently did not argue that their conduct was not "public." Here, defendant makes precisely that argument. We therefore proceed to interpret the meaning of the term "public" as used in ORS 166.025(1).

The statute originated as a proposal by the 1967 Criminal Law Revision Commission. That proposal was enacted by the 1971 Legislative Assembly without any changes. As originally enacted, ORS 166.025(1) (1973) provided:

"A person commits the crime of disorderly conduct if, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he:

"(a) Engages in fighting or in violent, tumultuous or threatening behavior; or

"(b) Makes unreasonable noise; or

"(c) Uses abusive or obscene language, or makes an obscene gesture, in a public place; or

"(d) Disturbs any lawful assembly of persons without lawful authority; or

"(e) Obstructs vehicular or pedestrian traffic on a public way; or

"(f) Congregates with other persons in a public place and refuses to comply with a lawful order of the police to disperse; or

"(g) Initiates or circulates a report, knowing it to be false, concerning an alleged or impending fire, explosion, crime, catastrophe or other emergency; or

"(h) Creates a hazardous or physically offensive condition by any act which the person is not licensed or privileged to do."

Or Laws 1971, ch 743, § 220.[1]

In ordinary conversation, the word "public" can hold a variety of meanings. For our purposes, however, those meanings fall into two basic categories. First, public can be used to refer to a physical place. When used in that manner, public denotes a space that is "accessible to or shared by all members of a community." *Webster's Third New Int'l Dictionary* 1836 (unabridged ed 2002). Or, alternatively, one might be considered "in public" when one is in a place that is "accessible or visible to all members of the community." *Id.* Second, the term public may refer to something that affects "the people as an organized community" or "the people as a whole." *Id.* When used in this way, the term public relates to "community interests as opposed to private affairs." *Id.* The plain text of ORS 166.025 is somewhat ambiguous about which meaning the legislature intended when it drafted the phrase "public inconvenience, annoyance or alarm." Read in isolation, that phrase could refer to an "inconvenience, annoyance or alarm" that occurs in a public place; it could also refer to an "inconvenience, annoyance or alarm" that affects the community in general rather than an individual victim. The larger context of the statute, however, suggests that the legislature intended the latter meaning.

Subsections (c) and (f) of ORS 166.025 (1973) both prohibit specific types of conduct from being performed "in a public place." As part of the general overhaul of Oregon's criminal laws, the 1971 legislature also codified a definition of the term "public place":

---

[1] The current version of ORS 166.025(1) no longer specifically refers to such behaviors as the use of "abusive or obscene language," disturbing of a "lawful assembly," or the refusal to comply with an order to disperse. Nevertheless, those examples of disorderly conduct are relevant to our interpretive task because they provide context for the phrase "public inconvenience, annoyance or alarm."

"'Public place' means a place to which the general public has access and includes, but is not limited to, hallways, lobbies and other parts of apartment houses and hotels not constituting rooms or apartments designed for actual residence, and highways, streets, schools, places of amusement, parks, playgrounds and premises used in connection with public passenger transportation."

ORS 161.015 (10); Or Laws 1971, ch 743, § 3. The legislature's definition of the term "public place" is essentially the same as the ordinary meaning of the term "public" in reference to a physical space. But when the legislature uses different terms in the same statute, we generally assume that it intended to give those terms different meanings. *State v. Newell*, 238 Or App 385, 392, 242 P3d 709 (2010). If the legislature had intended "public inconvenience, annoyance, or alarm" to mean only activities that occur in a public place, then the word "public" in subsections (c) and (f) of the original version of the statute would be redundant. Thus, the legislature's use of the term "public place" in other parts of the statute is evidence that it intended the term "public inconvenience, annoyance or alarm" to refer to an intent to inconvenience, annoy, or alarm the community in general, whether the conduct occurred in a public place or not.

The legislative history of ORS 166.025 supports that interpretation. Commentary by the Criminal Law Review Commission explained that the new crime of "disorderly conduct" was "designed to replace much of the existing law presently classified as 'vagrancy' and 'disturbing the peace.'" Commentary to Criminal Law Revision Commission Proposed Oregon Criminal Code, Final Draft and Report § 220 (July 1970) (hereafter Commentary to Proposed Oregon Criminal Code). Disorderly conduct, however, does not encompass all of the conduct that was proscribed by those common-law offenses. The commentary explains that the proposed criminal code would no longer include provisions relating to vagrancy or other "status" offenses, which the commission considered archaic and possibly unconstitutional. *Id.* Moreover, some conduct that would have been classified as "a breach of the peace" at common law was to be covered by the new crime of "harassment." *Id.*

In *State v. Moyle*, 299 Or 691, 700-01, 705 P2d 740 (1985), the Supreme Court traced the evolution of the common-law crime of "disturbing the peace" or "breach of the peace" into the crimes of disorderly conduct and harassment. *Id.* As the court explained, those common-law crimes were essentially designed to protect both "individual as well as societal interests" and to help secure "a sense of personal security among the citizenry." *Id.* at 700. At common law, "a breach of the peace could occur either by a public disturbance or by disturbing a single individual." *Id.* at 701. The Criminal Law Review Commission elected to separate those different types of disturbances into the new statutorily defined crimes of disorderly conduct and harassment. Thus, as the commentary makes clear, disorderly conduct is "limited to disturbances of general or public impact." Commentary to Proposed Oregon Criminal Code § 223. Harassment, on the other hand, "is intended to reach disorderly conduct creating alarm or annoyance for an individual rather than the general public." *Id.* (internal quotation marks omitted; emphasis in original). Thus, the fundamental purpose of the crime of disorderly conduct is to protect the general public from conduct that threatens to erode the community's sense of safety and security.

We make one final observation about the phrase "public inconvenience, annoyance or alarm." The legislature used that phrase in the context of describing the mental state that a person must have in order to be guilty of disorderly conduct. In this case, the state alleged that defendant "recklessly" created a risk of public inconvenience, annoyance, or alarm. To act recklessly means "that a person is aware of and consciously disregards a substantial and unjustifiable risk" that a specified harm will occur. ORS 161.085(9). Thus, in this case, the state was required to adduce evidence that defendant consciously disregarded an unjustifiable risk that his behavior would affect not just specific individuals, but the public in general.

Here, it is undisputed that the three other people in the trailer saw and heard (and, at some level, became embroiled in) the fight between defendant and Silva. Certainly, defendant's decision to engage in violent conduct in the presence of other people weighs in favor of the finding

that the defendant recklessly ignored a risk to the public. *See Willy*, 155 Or App at 282, 287 (defendants' neighbors "heard bullets pass through trees near their house" and "were frightened by the noise"). Contrary to the state's argument, however, the mere fact that others observed defendant's conduct does not automatically mean that it affected "the public." Of course, every individual person is also a member of the general public. But, as shown by our discussion of the common-law origins of the crimes of disorderly conduct and harassment, the legislature meant to distinguish between conduct that affects "individuals" and conduct that affects the community in general. In this case, the record shows that a small group of people, all known to each other, had gathered in a private residence. Under such circumstances, the mere fact that several people were present is insufficient to prove that defendant would have been aware of a risk of his conduct causing "public inconvenience, annoyance or alarm."[2]

The record is also devoid of other evidence that might suggest that defendant knew of a risk that his conduct would affect the public. There is no evidence that the commotion inside of the trailer could have been heard or observed by anyone outside of the confines of the trailer itself. The state argues that the "jury could reasonably infer that a fight inside a small mobile home between five people accompanied by yelling, screaming, and cursing could be heard by the park's other residents, that is, the public." But such an inference, to be reasonable, requires some minimal information that does not exist in this record. We do not know, for example, how many other spaces at the trailer park were occupied or how many residents lived there, how close together the trailers were, how loud the fight was inside Silva's home, or whether the windows were open. Without any information about the surrounding environment, the state's theory that

---

[2] The state argued below, although it does not do so on appeal, that the responding police officers were also members of the public for purposes of the statute. For similar reasons as those just expressed, we reject the state's argument. Such a reading would expand the sweep of the disorderly conduct statute beyond what we believe the legislature reasonably intended. Law enforcement officers responding to a call are performing a duty under the law; it is an unnatural reading of the statute to say that such officers experience an "inconvenience, annoyance or alarm."

other people could have been disturbed by activity occurring wholly inside Silva's home is conjecture.

In short, we conclude that the state failed to prove that defendant recklessly created a risk of "public inconvenience, annoyance or alarm." Accordingly, defendant's motion for a judgment of acquittal on the charge of disorderly conduct should have been granted.

We turn next to defendant's challenge to the trial court's restitution award. For the reasons that follow, we conclude that that challenge is not properly before us.

The trial court entered the judgment of conviction against defendant on June 15, 2012. Thereafter, the court held a hearing and ordered defendant to pay $12,126.40 in restitution. However, the trial court did not immediately reduce that award to judgment.

Defendant filed a timely notice of appeal from the June 15 judgment. Thereafter, the Appellate Commissioner issued an order that explained that the June 15 judgment was not conclusive because it failed to reflect the dismissal of two counts with which defendant had been charged—that is, strangulation and fourth-degree assault, *see* 271 Or App at 548—and gave the court leave under ORS 19.270(4) to enter an amended judgment disposing of those two counts. *See* ORS 137.071(2)(f) (providing that a judgment document in a criminal case must "[s]pecify clearly the court's determination for each charge in the information, indictment or complaint); ORS 137.071 (providing, in part, that "the appellate court may give leave as provided in ORS 19.270 for entry of a judgment document that complies with this section"). Thereafter, the trial court entered two additional judgments—*viz.*, an August 9 supplemental judgment containing the restitution award and an October 3 "Second Supplemental Judgment" disposing of the two counts referenced in the commissioner's order.

Defendant filed an amended notice of appeal of the June 15 and October 3 judgments. That amended notice of appeal made no reference to the August 9 supplemental judgment embodying the restitution award. Because defendant did not appeal the August 9 supplemental judgment, his

challenge to the restitution award is not properly before us in this appeal and we cannot address it. *See* ORS 138.083(2)(b) ("Notwithstanding the filing of a notice of appeal, the sentencing court retains authority to determine the amount of restitution and to enter a supplemental judgment to specify the amount and terms of restitution."); ORS 138.083(3)(a) ("If the appellant intends to assign error to any part of the corrected or supplemental judgment, the appellant must file an amended notice of appeal from the corrected or supplemental judgment.").

Conviction for second-degree disorderly conduct reversed, otherwise affirmed.