Argued and submitted May 8, 2018, affirmed March 18, petition for review denied August 27, 2020 (366 Or 827)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

LAMETRIUS TARRELL DAVIS,
aka Lametrius Tarell Davis,
*Defendant-Appellant.*

Multnomah County Circuit Court
15CR22711; A161830

462 P3d 295

Defendant appeals from a judgment of conviction for first-degree robbery, assigning error to the trial court's denial of his motion for a judgment of acquittal. He argues that the state failed to adduce sufficient evidence of the "violent, tumultuous or threatening behavior" element of disorderly conduct because his conduct was purely speech and was not accompanied by physical force. *Held*: Viewed in the light most favorable to the state and in the context of the encounter as a whole, a rational trier of fact could have found that defendant resisted his friends' attempts to pull him back—a use of strength and power—and that defendant aggressively pushed an officer's hand away in a manner that would indicate an incitement to a response.

Affirmed.

Henry Kantor, Judge.

Matthew Blythe, Deputy Public Defender, argued the cause for appellant. Also on the brief was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Jamie Contreras, Assistant Attorney General, argued the cause for respondent. On the brief were Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Sharia Mayfield, Assistant Attorney General.

Before Lagesen, Presiding Judge, and DeVore, Judge, and James, Judge.

JAMES, J.

Affirmed.

**JAMES, J.**

Defendant appeals from a judgment of conviction for disorderly conduct in the second degree, ORS 166.025, assigning error to the trial court's denial of his motion for a judgment of acquittal. Defendant argues that the state failed to adduce sufficient evidence of the "violent, tumultuous or threatening behavior" element of disorderly conduct because the evidence showed that defendant's conduct was purely speech and was not accompanied by physical force. The state argues that it offered evidence, viewed in the light most favorable to the state, that would allow a rational trier of fact reasonably to conclude that defendant used physical force or engaged in physical conduct likely to produce imminent use of force by himself or others. We affirm.

"In considering a trial court's ruling on a motion for judgment of acquittal, we state the facts in the light most favorable to the state, reviewing 'to determine whether a rational trier of fact *** could have found the essential element of the crime beyond a reasonable doubt.'" *State v. Pucket*, 291 Or App 771, 422 P3d 341, *rev den*, 363 Or 727 (2018) (quoting *State v. Cunningham*, 320 Or 47, 63, 880 P2d 431 (1994), *cert den*, 514 US 1005 (1995)).

> "It is not proper for [a reviewing court] to hold that there is a reasonable doubt because of conflicts in the evidence. After a verdict of guilty, such conflicts must be treated as if they had been decided in the state's favor. After the conflicts have been so decided, [a reviewing court] must take such decided facts together with those facts about which there is no conflict and determine whether the inferences that may be drawn from them are sufficient to allow the jury to find [a] defendant's guilt beyond a reasonable doubt. [A reviewing court's] decision is not whether [it] believe[s] [the] defendant is guilty beyond a reasonable doubt, but whether the evidence is sufficient for a jury so to find."

*State v. King*, 307 Or 332, 339, 768 P2d 391 (1989) (citation omitted).

The facts underlying the incident are largely undisputed. Portland Police responded to a call at about 2:00 a.m. to the Holocene night club in Portland. The record does not

contain testimony about the contents of the call, nor why the police were originally dispatched.

The officer first on the scene, Sandler, testified that he saw an altercation upon his arrival:

"[PROSECUTOR]: Okay. And when you arrived at [Holocene] did you see a disturbance outside?

"[SANDLER]: When I arrived on scene there was a large crowd outside. There was a large group of black males that were engaged in yelling and pushing with some of the marked security personnel at [Holocene].

"[PROSECUTOR]: Okay. So you said there was a group of people yelling and pushing. Can you describe their behavior in a little more detail?

"[SANDLER]: You know, a lot of yelling, a lot of cursing, agitated movements; again, like I said, pushes and shoves being exchanged between security and the other subjects, and just kind of a lot of commotion going on there."

However, Sandler did not testify that he specifically witnessed defendant's participation in that altercation. In fact, his later testimony implies that defendant was not part of the initial altercation he observed upon arrival:

"[SANDLER]: And I began just talking to everybody that was on scene, trying to figure out what was going on.

"[PROSECUTOR]: Okay. So you said you were talking to people—

"[SANDLER]: Yes.

"[PROSECUTOR]: —trying to figure out what was going on?

"[SANDLER]: Yes, mostly to the security staff on scene.

"* * * * *

"[PROSECUTOR]: Okay. So did you interact with [defendant] during this incident?

"[SANDLER]: At that point I wasn't really interacting with him. I was interacting with the security staff that was on scene, as well as some of the other individuals that were on scene causing the disturbance."

Sergeant Schmautz arrived on the scene shortly after Sandler. He did not witness the pushing that had earlier been witnessed by Sandler. Rather, it appears that whatever had been occurring upon Sandler's arrival had deescalated with his presence. Schmautz observed a group of approximately six men who were arguing with club employees in front of the club. Schmautz testified that the men in the group were "demonstrably yelling, shouting, waving their arms around; just loudly arguing." He saw signs that subjectively indicated to him that a scuffle of some sort had occurred at some unknown point in time, for example shirts that were stretched or torn at the collar, but did not see any blood, bruises, or other physical indicators of violence. He also observed a small crowd gathered, watching the interaction. As Schmautz testified, "[t]here were people standing and watching. There's always people with their cameras up and filming and stuff like that."

Defendant "stood out to [Schmautz] as the one that was most demonstrative" because he was "kind of gesticulating around and jumping around." Although Schmautz testified that the entire group was arguing, it appeared to him that "[t]he other people in the group actually seemed to be trying to hold [defendant] back or calm him down." At that point, defendant, still arguing with the nightclub personnel, walked out into the street in front of the club. Officer Martiniuc, another officer on the scene, tried to get defendant to move out of the road and back onto the sidewalk by placing his hand on the small of defendant's back. Schmautz observed defendant push Martiniuc's hand away and say to the officer, "Don't fucking touch me." As Schmautz later testified, "at the time Officer Martiniuc put his hand on him, [defendant] aggressively pushed his hand away."

After the push of the hand, Schmautz stood in the middle of the road to "demonstrate, you're not going to go beyond here" and ordered defendant multiple times to get back on the sidewalk. Defendant's friends also tried to get defendant back to the sidewalk. Schmautz testified that defendant responded to his various orders to return to the sidewalk, saying "fuck you, I'll bust you up," and later, "I don't care if they have a badge and gun." He explained that

defendant did not really comply with his request to get back on the sidewalk, "basically his friends [were] pulling him, they're physically dragging him back to the sidewalk."

At this point, Schmautz made the decision that defendant would be arrested because he was acting out not only toward the officers, but also to his friends, and "it's clear that order [was] not going to be restored." Defendant was still in the road, alongside a group of his friends, "still saying he was going to beat [the officers] up and waving his arms around, acting in a threatening manner." Schmautz walked up to the group, and said to them, "hey, you guys are free to go," and to defendant, "you're not free to go, you're under arrest, sit down on the sidewalk." Defendant did not comply with the order to sit down and started to walk away. Schmautz walked alongside defendant, buying time until more officers showed up to help with defendant's arrest. He repeatedly told defendant, "You're under arrest, you're under arrest, you're not free to leave."

After defendant turned a corner, Schmautz and another officer began trying to handcuff him, but "he just broke away from our hands and took off running." Schmautz clarified that, although defendant started running, "he didn't try to punch us or anything." Schmautz chased defendant, who eventually stopped and walked into the middle of the street, at which point the officers caught up and took him into custody. Sandler and another officer arrested defendant, who continued to yell and curse at them. Sandler testified that she had to physically move defendant over to the police vehicle to place him in the police car because he continued to pull away from her and told her that "he was going to find [her] later, beat [her] up, shoot [her]."

At trial, defendant moved for a judgment of acquittal on the ground that, even in the light most favorable to the state, the state had not established sufficient evidence on the charge of disorderly conduct. Defendant contended that the state had not produced sufficient evidence on the "violent, tumultuous or threatening behavior" element because there was only evidence of defendant "gesticulating," "spouting off statements," pushing an officer's hand away from him, being aggressive, and maybe flexing. According to defendant,

there was no evidence of him fighting anyone when the officers observed him. That motion was denied, and defendant was convicted of disorderly conduct in the second degree, ORS 166.025.[1]

On appeal, defendant assigns error to the denial of his motion for a judgment of acquittal, contending that the state failed to prove that defendant used actual physical force or that his conduct was likely to produce the use of physical force either by defendant or by an objective third party responding to him. The state asserts that a rational trier of fact could reasonably conclude that defendant engaged in physical force or physical conduct that is immediately likely to produce the use of physical force given evidence that defendant was part of a crowd that had recently been involved in a physical altercation, and that he physically pushed a police officer's hand away from his body, repeatedly shouted profanities, made violent threats to police officers, disobeyed police orders, and escaped from custody.

ORS 166.025 provides, in relevant part:

"(1)   A person commits the crime of disorderly conduct in the second degree if, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, the person:

"(a)   Engages in fighting or in violent, tumultuous or threatening behavior;

"(b)   Makes unreasonable noise;

"(c)   Disturbs any lawful assembly of persons without lawful authority;

"(d)   Obstructs vehicular or pedestrian traffic on a public way;

"(e)   Initiates or circulates a report, knowing it to be false, concerning an alleged or impending fire, explosion, crime, catastrophe or other emergency; or

"(f)   Creates a hazardous or physically offensive condition by any act which the person is not licensed or privileged to do."

---

[1] Defendant was also convicted of escape in the third degree, ORS 162.145, and interfering with a peace officer or parole and probation officer, ORS 162.247.

ORS 166.025 is constructed in two parts. First, the statute establishes that the state must prove that a person acted either "with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof." ORS 166.025(1)(a) to (f) then set out a series of acts that, "if done with one of the alternative mental states (with intent or recklessly) specified in ORS 166.025(1), will establish the crime of disorderly conduct." *State v. West*, 298 Or App 125, 131, 445 P3d 1284, *rev den*, 365 Or 722 (2019).

Although, the parties' focus on appeal is the act element of disorderly conduct, there is one aspect of our jurisprudence on the mental state component of the statute that bears on our consideration in this case, as discussed below. We have noted that the mental state component of disorderly conduct requires an intent to cause, or a reckless disregard of the risk of causing, *public* inconvenience, annoyance or alarm. "[T]he state [is] required to adduce evidence that [the] defendant consciously disregarded an unjustifiable risk that his behavior would affect not just specific individuals, but the public in general." *State v. Love*, 271 Or App 545, 554, 351 P3d 780 (2015). As we noted in *Love*,

> "[t]he mere fact that others observed [the] defendant's conduct does not automatically mean that it affected 'the public.' Of course, every individual person is also a member of the general public. But, as shown by our discussion of the common-law origins of the crimes of disorderly conduct and harassment, the legislature meant to distinguish between conduct that affects 'individuals' and conduct that affects the community in general. In this case, the record shows that a small group of people, all known to each other, had gathered in a private residence. Under such circumstances, the mere fact that several people were present is insufficient to prove that [the] defendant would have been aware of a risk of his conduct causing 'public inconvenience, annoyance or alarm.'"

*Id.* at 555.

Critically, we also held in *Love* that inconvenience, annoyance, or alarm by responding law enforcement is insufficient to establish *public* inconvenience, annoyance or alarm:

"The state argued below, although it does not do so on appeal, that the responding police officers were also members of the public for purposes of the statute. For similar reasons as those just expressed, we reject the state's argument. Such a reading would expand the sweep of the disorderly conduct statute beyond what we believe the legislature reasonably intended. Law enforcement officers responding to a call are performing a duty under the law; it is an unnatural reading of the statute to say that such officers experience an 'inconvenience, annoyance or alarm.'"

*Id.* at 555 n 2.

Turning to the act component, as discussed, ORS 166.025(1)(a) to (f) specify six different acts that, when paired with the mental state, can constitute disorderly conduct. For this case, only ORS 166.025(1)(a) is involved—that is, "engag[ing] in fighting or in violent, tumultuous or threatening behavior." We have consistently construed ORS 166.025(1)(a) "in a manner that will not infringe upon constitutionally protected speech." *State v. Hosley*, 282 Or App 880, 883, 388 P3d 387 (2016). In *State v. Cantwell*, 66 Or App 848, 852, 676 P2d 353, *rev den*, 297 Or 124 (1984), we held that "fighting" and "violent, tumultuous or threatening behavior" as specified in ORS 166.025 refer only to "physical acts of aggression, not speech."

In *Cantwell*, we held that ORS 166.025(1)(a) only penalizes the use of "physical force" or "physical conduct which is immediately likely to produce the use of such force." 66 Or App at 853. Physical force, we have held, is not the Newtonian force found in every physical act, but the "actual use of strength or power." *State v. Atwood*, 195 Or App 490, 498, 98 P3d 751 (2004).

Further, we have recognized the distinction between force that is "primarily speech" or merely incidental to speech, from our definition of "physical conduct." *Hosley*, 282 Or App at 883. Thus, while grabbing hold of a person's shoulder to guide them to a place to talk constitutes "a physical act, it is also a common method of gaining someone's attention and does not rise to the level of physical force required under the statute." *State ex rel Juv. Dept. v. Krieger*, 177 Or App 156, 161, 33 P3d 351 (2001); *see also State v.*

*Richardson*, 277 Or App 112, 118, 370 P3d 548 (2016) (banging on a door and shouting for someone to open it was primarily speech); *cf. State v. Miller*, 226 Or App 314, 318, 203 P3d 319 (2009) (kicking a sign was not "incidental physical conduct" because it was not incidental to speech—the defendant did not "kick the sign as a common method of gaining someone's attention" (internal quotation marks omitted)).

In assessing whether conduct constitutes "physical force" or "physical conduct which is immediately likely to produce the use of such force" a court is faced with a critical, but difficult, analytical distinction. On the one hand, the focus of the inquiry must be solely on the act, not the accompanying speech. *Krieger*, 177 Or App at 160 ("Under *Cantwell*, the question whether youth engaged in 'threatening behavior' prohibited by the disorderly conduct statute must be answered by looking at his physical actions, not his speech."). Despite this, however, a court is allowed to consider the surrounding circumstances in assessing the act. Those circumstances can include accompanying speech. However, in allowing the speech to be considered as context, a court must be mindful of not allowing the speech to become a proxy for what must remain the focus of the inquiry—the physical act itself. *See Hosley*, 282 Or App at 883 ("A person's speech may provide circumstantial context for determining whether or not the person's conduct was 'immediately likely to result in physical force,' but ORS 166.025(1)(a) does not reach 'conduct that is itself speech' or that is 'primarily speech.'").

We now turn to applying those principles here. We begin by noting this is a close case. And, although we ultimately conclude that, viewed in the light most favorable to the state, sufficient evidence existed to permit the questions to go to the jury, it was by the narrowest of margins. We also note at the outset what we are not considering. On appeal, the state relies, in part, on the actions of defendant in walking away, then running from, the officers. However, the record appears unclear as to whether those actions occurred in a location that was visible to the crowd. Testimony indicated that defendant had turned a corner and proceeded down a different alley or street from the original club location. Under *Love*, the disorderly conduct statute does not

encompass actions done with intent to cause inconvenience, annoyance, or alarm to officers. 271 Or App at 555 n 2. We therefore confine our review to the evidence presented by the state that corresponds to defendant's acts that were viewable by the crowd and the public generally.

The record shows two physical acts by defendant that we view in combination with each other. First, officers testified that defendant was being restrained and pulled back by his companions, in an attempt to disengage him from the encounter. That testimony supports an inference that defendant was resisting those attempts to pull him back—a use of strength and power. In the posture of a motion for judgment of acquittal, a reviewing court is required to view the evidence in the light most favorable to the state, including all reasonable inferences that a jury could draw from those facts. *Cunningham*, 320 Or at 63.

Second, one officer testified that defendant "aggressively pushed his hand away." It is entirely reasonable for a person to protect their bodily autonomy and to demand an immediate cessation of any unwanted contact, as defendant did here when he said "don't fucking touch me." That is protected speech. The accompanying natural reactive response—to push away the offensive contact—might well be physical force purely incidental to that speech. However, here, the testimony in the record is that defendant did so in an "aggressive" manner. That descriptor—aggressive— colors the physical act and creates a question of fact. If that testimony is believed by a jury, they might conclude that the push was aggressive simply because the reaction to the unwanted contact was strong. Alternatively, a jury could conclude that it was aggressive beyond simply being a reaction and was aggressive in a manner that would indicate an incitement to a response. Under the standard of review applied to a motion for judgment of acquittal, the state must receive the benefit of that factual uncertainty.

Both acts identified above, when viewed in combination, then must be placed in the broader context of the encounter as a whole. Here, that encounter included the presence of multiple individuals with torn clothing, the appearances of a disagreement that had spilled out of a

business and into the public, defendant going into the street during the course of the argument, the encounter being sufficiently startling so as to have drawn a crowd of people filming with phones, and statements by defendant to officers that he would "fuck you, I'll bust you up," and, "I don't care if they have a badge and gun." Within that context, although close, we cannot conclude that, in the light most favorable to the state, the evidence was so insufficient that no jury could have found defendant guilty of disorderly conduct beyond a reasonable doubt. *See King*, 307 Or at 339.

Affirmed.