Argued and submitted September 23, 2019, affirmed May 12, 2021

STATE OF OREGON,
*Plaintiff-Respondent,*
*v.*
THOMAS JOHN ROBERT ALLEN,
*Defendant-Appellant.*
Clackamas County Circuit Court
CR1401318; A166187

489 P3d 555

Defendant appeals from a judgment of conviction for first-degree assault and first-degree criminal mistreatment of his girlfriend's three-year-old child. The charges stem from an incident in which defendant called 9-1-1 after he was unable to wake the child, who had to undergo life-saving brain surgery to treat a subdural hemorrhage and brain swelling. On appeal, defendant primarily challenges the trial court's denial of his pretrial motion to exclude expert testimony that the child was diagnosed with abusive head trauma. Among other things, he also challenges the trial court's denial of his motions for judgment of acquittal and request for special jury instructions based on his argument that a greater mental state applied to the physical injury element of the charges. *Held*: The trial court did not err in concluding that the abusive head trauma diagnosis evidence was admissible scientific evidence, under OEC 401, OEC 702, and OEC 403. Additionally, defendant's arguments regarding the applicable mental state for the injury element of his charges are foreclosed by *State v. Barnes*, 329 Or 327, 986 P2d 1160 (1999).

Affirmed.

Susie L. Norby, Judge.

Marc D. Brown, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Jordan R. Silk, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Janis C. Puracal filed the brief *amicus curiae* for Forensic Justice Project.

Before Ortega, Presiding Judge, and Shorr, Judge, and James, Judge.

ORTEGA, P. J.

Affirmed.

### ORTEGA, P. J.

Defendant appeals from a judgment of conviction for first-degree assault and first-degree criminal mistreatment of his girlfriend's three-year-old child. The charges stem from an incident in which defendant called 9-1-1 after he was unable to wake the child, who had to undergo life-saving brain surgery to treat a subdural hemorrhage and brain swelling. On appeal, defendant primarily challenges the trial court's denial of his pretrial motion to exclude expert testimony that the child was diagnosed with abusive head trauma. We conclude that the trial court did not err in concluding that the evidence was admissible scientific evidence. We also conclude that the trial court did not err in denying defendant's motions for judgment of acquittal and in refusing to give defendant's requested special jury instructions, because defendant's arguments regarding the applicable mental state for the injury element of his charges are foreclosed by *State v. Barnes*, 329 Or 327, 986 P2d 1160 (1999). We reject the remaining assignments of error raised in defendant's opening brief without discussion.

In a supplemental brief, defendant argues that the trial court erred when it instructed the jury that it could reach a nonunanimous verdict and that that error constitutes structural error, requiring reversal. Defendant preserved his objection to the instruction, but the jury returned unanimous verdicts as confirmed through a jury poll. We reject defendant's structural error arguments as foreclosed by *State v. Flores Ramos*, 367 Or 292, 478 P3d 515 (2020), and conclude that any error in giving the erroneous nonunanimous jury instruction was harmless beyond a reasonable doubt based on the unanimous verdicts, as explained in *State v. Ciraulo*, 367 Or 350, 354, 478 P3d 502 (2020).

Accordingly, we affirm.

### FACTUAL BACKGROUND

We recount the evidence introduced at trial that is necessary to provide context for the issues we address on appeal. We include the procedural facts and any additional evidentiary context in our analysis of the issues.

At the time of the conduct at issue here, defendant lived with his girlfriend and her two children—her five-year-old daughter and her son, R, who was almost three. Defendant would look after the children while their mother was at work. One morning while he was watching the children, defendant called 9-1-1 and reported that, when he went to wake R, he found the child was not breathing. He further reported that he tried CPR and put R into a cold bath. He also reported that R had recently had pneumonia and that, at the time of the call, he was breathing, but was not awake, and defendant was unable to wake him. Upon confirming that defendant had called 20 minutes after finding R, the 9-1-1 dispatcher asked why defendant did not call sooner. He responded that it was because he rushed R into a cold bath and performed CPR and "was freaking out."

During the call, defendant also reported that R "was run over by the dogs." Two days before the call, R went over to the family's two Labrador dogs while they were eating, and they knocked him down under their raised dog dishes, pressing his ear to the heater vent. Defendant reported that the dogs had "stomped" on R "really hard." Defendant did not seek medical assistance at the time, and R said that he was okay. R's mother was at work during the incident with the dogs, but defendant and R told her about it that day and she observed that R's ear "looked like it was pinched" and that he had a half-dollar-sized bruise on his back. Defendant later reported that R had also fallen and bumped his forehead on a concrete step a few days before, which gave R a "knot" on his head.

When first responders arrived following defendant's 9-1-1 call, they found R unconscious, pale, and without a detectable pulse. After they performed CPR, R's color improved, and they transported him by ambulance to the hospital. R was diagnosed with an "acute left convexity subdural hemorrhage," which means that he had subdural bleeding along the left side of his head. R's initial CT scan showed brain swelling and a hemorrhage on the left side of his brain, with indications that both old and new blood was present.

R underwent emergency surgery to decrease the pressure on his brain and remove the blood. His neurosurgeon,

Dr. Grewe, also noted that R had bruising on his left ear. The surgery, which involved removing a portion of R's skull, revealed that the hemorrhage consisted of all new blood and no old blood, which indicated an acute, or recent, injury. An acute injury would be one occurring within two days; it would not be a week-old injury. Two doctors who became involved in R's care after his surgery, Dr. Leonhardt and Dr. Lang, testified that, because the CT scan of R's brain suggested the presence of both old and new blood, it was likely that R had suffered a hyperacute injury—an injury that was hours old rather than days old; that would explain the impression of both older and newer blood on the CT scan, despite there being no "old" blood present, as observed during surgery.

After surgery, the ICU doctor was concerned that R would not survive the night and, because of the nature of his injuries, called Leonhardt for an immediate consult. Leonhardt is a pediatrician at Child Abuse Response and Evaluation Services (CARES) and specializes in treating abuse. Leonhardt observed that R did not appear to have a skull fracture or lumps on his head, which would indicate a contact injury. Leonhardt took photographs of bruises he observed on R, which included bruising on both the inside and outside of his left and right ear, on his back, and on his elbow, and included petechia—small broken blood vessels— on his lower neck near the collarbone. Leonhardt testified that the ear bruising was particularly concerning, because it was not in an area commonly injured by accident. He recommended additional medical evaluations and referred the case to Lang, another pediatrician who specializes in treating abuse with CARES.

R's bloodwork did not reveal a bleeding disorder, X-rays showed that R had no additional injuries, an MRI of R's brain confirmed the subdural hemorrhage and indicated a "shear injury" to R's brain itself, and an eye examination found in both R's eyes a few, scattered retinal hemorrhages, or bleeding in the eye. The shear injury to R's brain indicated "that the brain had gone through some acceleration and deceleration." The retinal hemorrhages were less conclusive. Lang explained that, in the case of abusive head trauma, children can have "very significant" retinal hemorrhages, as

in too many hemorrhages to count. R's results showed "more than what we would expect in an accident," but he "certainly [did not] have the retinal hemorrhages that are too many to count or that would be clearly almost diagnostic of abusive head trauma."

Grewe, R's neurosurgeon, testified that a shear injury is produced by trauma and that the type of injury to R implied that he suffered an acceleration and sudden deceleration. He also testified that he did not believe that R's fall on the concrete step or the incident with the dogs could have resulted in R's injury, because R did not experience loss of consciousness, scalp swelling, or skull fracture from those incidents and because "it takes a big trauma to produce what he had."

Leonhardt opined that all the results, including the absence of a contact injury, suggested that R's injury was an "acceleration/deceleration injury," which could occur if a child is violently shaken or thrown down onto a soft surface. Leonhardt testified:

> "So my opinion or diagnosis at that time was that [R's] clinical presentation, so what brought him to the hospital and the findings that we had seen so far—the bruising, the subdural hemorrhage—were the result—were not the result of an accidental fall that I had been told about two days old—ago—earlier. That they were more consistent with child abuse or that—abusive head trauma, specifically, for his head injury and then child physical abuse for the bruises."

Lang testified that bruising on R's torso, back, ears, and neck are "significantly associated with abuse." Lang also testified that the bruising and swelling on R's elbow "was outside the range of normal." In looking at R's case, Lang ruled out other causes for R's injury. Ultimately, taking into account the bruising and lack of a contact injury, Lang concluded that his brain injury "was most consistent with abusive head trauma and child physical abuse." Lang testified that, based on the severity of the injury, R would have become immediately symptomatic, indicating that his injury had to be caused within a few hours before R's first CT scan, which indicated a hyperacute injury. Lang also opined that R suffered "some sort of violent acceleration/

deceleration injury" that could not have been caused by R just falling on his own.

The jury found defendant guilty of first-degree assault and first-degree criminal mistreatment by unanimous verdicts. This appeal followed.

## EXPERT TESTIMONY

Before trial, defendant moved to exclude, as inadmissible scientific evidence, the introduction of expert testimony regarding "evidence of diagnosis of 'shaken baby syndrome' (SBS) or 'abusive head trauma' (AHT)," including the diagnoses of abusive head trauma by Leonhardt and Lang that ultimately were introduced at trial, as set out above. Defendant argued that such evidence was not scientifically valid under *State v. Brown*, 297 Or 404, 687 P2d 751 (1984), and *State v. O'Key*, 321 Or 285, 899 P2d 663 (1995), which require the proponent of scientific evidence to show that "the proposed evidence is based on scientifically valid principles and is pertinent to the issue to which it is directed." *O'Key*, 321 Or at 303. Defendant challenged all three aspects of the *Brown* and *O'Key* inquiry, contending that the evidence was not relevant under OEC 401, was not helpful to the trier of fact under OEC 702, and was subject to exclusion under OEC 403. *See State v. Perry*, 347 Or 110, 121, 218 P3d 95 (2009) ("Under *Brown* and *O'Key*, scientific evidence is admissible if it is relevant under OEC 401, helpful to the trier of fact under OEC 702, and not subject to exclusion under OEC 403." (Footnotes omitted.)). Defendant, however, did not challenge in his written motion how the abusive head trauma diagnosis was applied in R's particular case.

The trial court conducted a pretrial evidentiary hearing, under OEC 104, to determine whether the challenged evidence was scientific and whether it met the foundational standards for scientific evidence articulated in *Brown* and *O'Key*. At the hearing, the state presented testimony from Lang about her credentials and the scientific foundation for the abusive head trauma diagnosis—what it is, how it is diagnosed, safeguards against misdiagnosis, and its general acceptance in the pediatric medical field. We

summarize the portions of that testimony that are most pertinent to the arguments defendant raises on appeal.

Lang is board-certified in general pediatrics and in child abuse and neglect and works as a child abuse pediatrician at CARES. She testified that she first became familiar with abusive head trauma during her pediatrics residency when she did a rotation with a child abuse and neglect team. Education regarding abusive head trauma is now included in the medical school curriculum at some schools.

Lang explained the difference between shaken baby syndrome and abusive head trauma:

"So the shaken baby term is actually only used now in prevention because it's a very good prevention technique that people understand: Never shake a baby. And we certainly know, based on literature, that shaking a baby can have extremely profound effects on the child, even can be fatal.

"The term is dated for a number of reasons. It doesn't include all of the maltreatment or inflicted injury that could happen to a child's head. So, for instance, if there was a contact injury or different types of injury, such as asphyxia, that is not necessarily shaking, but leads to inflicted injury of the child's head and brain.

"So by using a term such as abusive head trauma is more inclusive to all of the different mechanisms that can affect a child's head, brain and its contents when a child is injured in an inflicted manner. It also—we try not to focus so much on a discrete mechanism so much as we try to be more correct in the diagnosis."

Lang testified that a recent study "concluded that the diagnoses of shaken baby syndrome and abusive head trauma were generally accepted by physicians who frequently encounter suspected child abuse cases[,] [a]nd they were considered likely sources of subdural hematoma, severe retinal hemorrhages and coma or death in young children." The vast majority of respondents—96.7 percent—indicated that they considered abusive head trauma a valid diagnosis. Lang also testified that there are a "small number" of dissenters in the medical community, but that they tend to work in fields other than pediatrics and tend to be the

same 10 or 20 people that come out with studies or testify as experts in hearings against the diagnosis.

With regard to the error rate for the diagnosis, Lang testified that there have been well over 700 studies with "different strengths of association and rates." A difficulty is that it would not be ethically sound to expose a child to trauma to see what happens. There is "quite a bit" of specialized literature on abusive head trauma, as well as related topics, "such as retinal hemorrhages, cerebral edema, seizures, apnea, histories, outcomes, [and] associated other injuries." She also explained that the studies since the 1960s have evolved from just observational to case-controlled studies and prospective studies that have "delineated what we see with abusive head trauma and what we don't see with abusive head trauma."

Lang also explained that, whenever there is an abusive head trauma diagnosis, it is always peer reviewed with fellow physicians. She testified that the diagnosis is typically objective, although the child's history will factor into it. The objective data is the laboratory results and imaging studies. The subjective component is the history and social history provided by the family. She stated that "we use both objective markers and the history provided to make our diagnosis because we do things based on the entire picture." She explained that there are standards applied, which include the typical tests to look for injury and to rule out other diagnoses. The particular tests will vary somewhat depending on the precise injury that the child presents with. The safeguards against a misdiagnosis are the peer review process, keeping up with the literature, and also attending conferences "to make sure that we're practicing in the realm of what's accepted."

As part of that discussion, Lang also explained that relying solely on the traditional "triad" of symptoms— subdural hematomas, retinal hemorrhages, and brain dysfunction—to diagnose abusive head trauma has been discarded as a methodology. She explained that "what we really look at now is just the overall picture of everything * * *[;] there's a lot more methodology to it."

With regard to distinguishing head trauma and abusive head trauma, Lang testified that, for example, a baby who has been accidentally dropped may have a subdural hematoma, "but it's a very different-looking subdural hematoma than in a child that has the acceleration-deceleration." She explained that, "for instance, we have studies that show an acceleration-deceleration, it's typically over the convexities, which is basically this part of the brain, versus in contact, it's going to be right over the point of contact." They also look at other things to rule out, such as whether the child has a bleeding disorder, brain atrophy, a condition that would predispose the child to have a subdural hematoma like enlarged spaces in the skull or a previous surgery, or other potential medical conditions that could cause the injury. Lang testified that

> "it's pretty similar to basically any differential diagnosis that any doctor would make for any condition. And it's pretty well known that once you get to the point of retinal hemorrhages and a subdural hematoma that's over the convexity. And if you don't have that history of trauma and you don't have anything else to explain it medically, then that's when the concern for abusive head trauma presents."

Lang also explained that there are multiple types of head trauma diagnoses that can fit under abusive head trauma, not just subdural hematoma. She testified that sometimes there is a witness to the injury, but often it requires going through the differential diagnosis and "making sure we're crossing things off the list and then seeing what we're left with." She explained that most of the time the process involves trying to distinguish between accidental trauma and inflicted trauma. There are studies that look at what is seen with short falls and rotational falls, and then she compares that to the history given and whether it explains the injuries.

She also explained that an abusive head trauma diagnosis is important medically for treatment purposes after the initial intervention, because children with abusive head trauma tend to have worse outcomes than those with accidental trauma, and also have higher rates of seizures and apnea, so the diagnosis is important to make sure that treatments are geared for the child, such as checking

for other trauma to the body and that the child is in a safe environment.

Following the presentation by the state, defendant challenged the state's failure to present evidence that the abusive head trauma diagnosis was properly applied in this case and also argued that the state failed to put on evidence of articulated, particular standards that are applied for the purpose of diagnosing abusive head trauma. The state explained that it did not present evidence detailing how Lang arrived at an abusive head trauma diagnosis in this case because defendant's motion had challenged only the scientific foundation for the diagnosis, which the state argued it had sufficiently addressed.

The court issued a letter opinion denying defendant's motion to exclude that evidence. After summarizing the issue and Lang's testimony, the court made specific findings, applying the factors from *Brown* and *O'Key* for determining the admissibility of scientific evidence.[1] Those findings are as follows:

---

[1] The trial court's factor-specific findings were based on the guidelines in *Brown*. That case set out seven nonexclusive factors to use as guidelines: "(1) The technique's general acceptance in the field; (2) The expert's qualifications and stature; (3) The use which has been made of the technique; (4) The potential rate of error; (5) The existence of specialized literature; (6) The novelty of the invention; and (7) The extent to which the technique relies on the subjective interpretation of the expert." *Brown*, 297 Or at 417.

*Brown* also noted the potential usefulness of 11 other factors, some of which overlapped with the seven already set out: "(1) The potential error rate in using the technique; (2) The existence and maintenance of standards governing its use; (3) Presence of safeguards in the characteristics of the technique; (4) Analogy to other scientific techniques whose results are admissible; (5) The extent to which the technique has been accepted by scientists in the field involved; (6) The nature and breadth of the inference adduced; (7) The clarity and simplicity with which the technique can be described and its results explained; (8) The extent to which the basic data are verifiable by the court and jury; (9) The availability of other experts to test and evaluate the technique; (10) The probative significance of the evidence in the circumstances of the case; and (11) The care with which the technique was employed in the case." *Id.* at 417 n 5. The Supreme Court in *O'Key* also discussed four additional factors that may be useful, and which overlap somewhat with the *Brown* factors: (1) "whether the theory or technique in question can be (and has been) tested"; (2) "whether the theory or technique has been subject to peer review and publication"; (3) "the known or potential rate of error and the existence of operational standards controlling the technique's operation"; and (4) "the degree of acceptance in the relevant scientific community[.]" *O'Key*, 321 Or at 303-04 (internal quotation marks omitted).

"1.   Techniques for arriving at diagnoses of [shaken baby syndrome (SBS)] and [abusive head trauma (AHT)] are generally accepted in the medical field.

"2.   Dr. Lang's qualifications to make such diagnoses are impressive, and indicate she has attained a high degree of mastery of the techniques used to make such diagnoses.

"3.   The techniques have been used to determine what medical treatment measures are necessary to facilitate healing from specific forms of child head injuries.

"4.   The potential rate of error cannot be easily quantified because testing for rate of error would necessarily involve unethical practices that may also be criminal.

"5.   There is voluminous specialized literature on techniques for diagnoses of SBS and AHT.

"6.   The invention is not novel; it has been relied on long enough to become part of medical school curriculums in the recent past, and to be subject to national Board Certification.

"7.   The technique relies, in part, on the subjective interpretation of the expert, but also relies on objective data, like laboratory results and imaging tests like MRIs, CAT scans and PET scans, which provide information about the size and location of any brain bleeds, the area(s) where the child's cranium and brain incurred damage, and visual data about whether the specific head trauma indicates impact with a hard object, or acceleration and deceleration of the head.

"8.   Safeguards are used in reaching diagnoses of SBS and AHT, through consultation and immediate peer reviews among medical colleagues for each diagnosis.

"9.   The expert the state is calling on this subject describes the techniques she uses clearly, although they are not simplistic techniques, and she also explains the reasons for results she reaches in a transparent way.

"10.   Other experts are available to evaluate the techniques.

"11.   In the circumstances of the instant case, the diagnosis is probative on a significant evidentiary matter."

The trial court also remarked:

"Although the state did not offer evidence to demonstrate the care with which the technique was employed in

this case, Dr. Lang's testimony was more than sufficient to convince the court that she would apply this diagnostic technique carefully, thoughtfully and thoroughly whenever she implements it."

Based on those findings, the court concluded that the expert testimony that may include an abusive head trauma diagnosis met the standard for the admissibility of scientific evidence.

On appeal, defendant challenges the trial court's denial of his pretrial motion to exclude the diagnosis of abusive head trauma as inadmissible scientific evidence. The admissibility of scientific evidence is a legal question that we review for legal error. *State v. Reed*, 268 Or App 734, 738, 343 P3d 680, *rev den*, 357 Or 551 (2015).

We first clarify the arguments that we must address in this appeal. Here, defendant does not challenge that R's physical condition was properly diagnosed through the medical tests that were ordered nor does he challenge that R suffered from head trauma. He also does not challenge any of the testifying physicians' qualifications or argue that they improperly applied the SBS/AHT theory to the facts of R's case. Rather, defendant argues only that the theory of SBS or AHT itself is not a scientifically valid theory of medical causation under *Brown* and *O'Key* and, thus, testimony about it should be excluded in all instances. That is, defendant's only challenge is to Lang and Leonhardt having been permitted to testify that R's injuries were consistent with *abusive* head trauma.

Before turning to defendant's arguments, we frame the specific inquiry we must make in this case. In *Miller v. Elisea*, 302 Or App 188, 459 P3d 887 (2020), we recently discussed how to evaluate a challenge to medical causation under the *Brown* and *O'Key* standards. Similar to the challenge being made here, in *Miller*, the defendant did not challenge the plaintiff's physical condition—the plaintiff undisputedly had a fibromyalgia condition—but rather challenged the plaintiff's expert's testimony regarding medical causation of that condition, there, that it was caused by the physical trauma of a car accident. We explained in *Miller* that the Supreme Court cases in *Marcum v. Adventist Health*

*System/West*, 345 Or 237, 193 P3d 1 (2008), and *Jennings v. Baxter Healthcare Corp.*, 331 Or 285, 14 P3d 596 (2000), provide the proper framework for the inquiry into the scientific validity of a theory of medical causation, because, as explained in *Marcum*, while the general guidance in *Brown* and *O'Key* for the admissibility of scientific evidence is helpful, it provides "only limited guidance on the issue of scientific evidence of medical causation." *Miller*, 302 Or App at 191-92.

In *Marcum*, the Supreme Court addressed a situation similar to that in *Miller* and to that presented here—whether the expert's theory of causation was scientifically valid "in the absence of a 'demonstrable mechanism of causation,' and for which there was not some independent, verifiable corroboration." *Miller*, 302 Or App at 191 (quoting *Marcum*, 345 Or at 240, 249). First, the court in *Marcum* stated that "'differential diagnosis' is an accepted technique in which 'a doctor develops a list of all diseases that might cause a patient's symptoms and then, by a process of elimination, narrows the list.'"[2] 345 Or at 247 (quoting *Jennings*, 331 Or at 291). A differential diagnosis is a methodology accepted by the medical community for determining a condition or causation of a condition. *Marcum*, 345 Or at 247.

However, the court explained, testimony is not admissible simply because the expert used a differential diagnosis, rather, "admissibility will turn on whether the particular use of differential diagnosis to determine causation meets the more general test of scientific validity." *Id.* at 248 (citing *Jennings*, 331 Or at 305-10). "[T]he basis for establishing the scientific validity of a differential diagnosis will vary depending on the type of injury." *Marcum*, 345 Or at 248. For example, a long-latency exposure or a complex chain of causation may require extremely accurate data, methods, and controlled error rates, whereas "in a single, sharp event, [where] the injury is immediate and localized" it may be appropriate to "rule in" that event, "particularly

---

[2] The court further explained that "differential diagnosis involves a process by which a medical expert first 'rules in' various potential causes and then 'rules out' those causes one by one (to the extent possible) by analyzing the patient's condition until the expert can identify the likely cause from among those remaining." *Marcum*, 345 Or at 247.

when there are few obvious alternative causes." *Id.* at 249. When "ruling in" a potential cause, "a trial court should insist that the causation theory be 'biologically plausible,' that is, that the exposure *could* have caused [the] injury." *Id.* (emphasis in original). However, "a particular possible cause should not necessarily be excluded on the grounds that the expert cannot describe the precise mechanism of causation or point to statistical studies of cause and effect." *Id.*; *see also Kennedy v. Eden Advanced Pest Technologies*, 222 Or App 431, 448-49, 193 P3d 1030 (2008) (stating that a conflict in the scientific community between qualified experts about the validity of a technique is not a basis for excluding the testimony). The court in *Marcum* also explained that ruling out potential causes should be a scientifically valid process, based on things such as research, physical examination, and testing, in an effort to identify the actual cause. *Marcum*, 345 Or at 248, 252-53. However, "[e]ven if the expert is not able to eliminate *all* alternative causes, the testimony nevertheless may be reliable and admissible if sufficient potential causes are eliminated for the expert to identify one particular cause as the likely cause of the condition." *Id.* at 248 (emphasis in original).

With the frame of the inquiry we must make in mind, we turn to defendant's arguments. Defendant frames the issue as the validity of SBS/AHT theory, which he defines as "a theory that a child who suffers subdural hemorrhages and retinal hemorrhages with minimal evidence of impact has been subjected to abuse." Defendant asserts that the relevant scientific community for evaluating the theory is the biomechanical field, which is divided on whether the theory is reliable. He points to scientific articles that have stated that the theory that shaking a child can cause subdural hematomas and retinal hemorrhages is biomechanically improbable. Defendant also cites scientific articles to support his assertion that the presence of subdural and retinal hemorrhages have a broad range of potential causes, including accidental trauma, short falls, prenatal conditions, congenital malformations, disease, metabolic disorders, hypoxia, childhood stroke, infection, birth injuries, "rebleeds," and toxins. That is, defendant asserts, there is nothing unique to abuse as a cause of subdural and retinal hemorrhages.

Defendant asserts that, as a result, "the SBS/AHT theory that subdural and retinal hemorrhaging is 'diagnostic' of abuse is not generally accepted in the relevant scientific community, and Lang's 'diagnosis' that rested on that theory was unreliable."

Defendant also argues that the SBS/AHT theory is highly subjective, which undermines its reliability. Defendant points out that there is no standard methodology or guidelines; rather, it relies on clinical judgment and gathering information from various sources to determine if the injuries are consistent with accidental trauma or abusive head trauma. Defendant asserts that that process inserts subjectivity at every point. He also points out that the potential error rate is unknown, because testing cannot be ethically done and thus research is limited to children who have been treated or died, which in turn relies on the clinical judgment of the treating physician. Defendant also similarly argues that the diagnosis is lacking in safeguards to minimize subjectivity and enhance accuracy. Defendant acknowledges that physicians use a differential diagnosis approach by "ruling out" other causes, but he argues that "that process does not render the diagnosis reliable if the expert draws only from evidence that supports the SBS/AHT theory."

Turning to our analysis, we reiterate that defendant is arguing only that the abusive head trauma diagnosis can never be admissible because it is a scientifically unreliable theory of medical causation, after having defined it as a theory that a child with subdural and retinal hemorrhages and no impact injury has been subject to abuse. He does not assert any argument directed at how Lang defined the diagnosis or described her process for arriving at such a diagnosis, which was then applied to this case. With that understanding, analyzing defendant's argument is difficult, because it is largely nonresponsive to Lang's testimony at the OEC 104 hearing and to the factors that the Supreme Court has explained are the focus of the OEC 702 inquiry in cases of medical causation using a differential diagnosis methodology. *See Marcum*, 345 Or at 247-49 (stating, among other things, that "admissibility will turn on ***

the *particular use* of differential diagnosis to determine if causation meets the more general test of scientific validity" (emphasis added)); *see also State v. Sanchez-Alfonso*, 352 Or 790, 804, 293 P3d 1011 (2012) (focusing inquiry on the expert's expertise, "how he or she gathers and uses particular information, how that information informs his or her conclusions, and the scientific basis for the steps that he or she takes in that process"). Lang specifically testified that relying solely on the triad of symptoms has been discarded as a methodology and that what is done now is to look at the overall picture and apply a differential diagnosis that is used by doctors for any condition; defendant also recognized in his argument that that is the approach. However, defendant's arguments are not directed at the differential diagnosis made in this case, specifically whether abusive head trauma could properly be "ruled in" in R's case as biologically plausible, or whether other causes for his injuries scientifically could be "ruled out," which is the inquiry we must make as directed by the Supreme Court in *Marcum* and *Jennings*. Despite that difficulty, some of defendant's arguments do touch on the type of inquiry we must make, so we proceed to address those arguments.

As we understand them, defendant's arguments boil down to the conflict between experts on the acceptance of the theory of causation and the subjective nature of making the diagnosis.[3] The conflict of acceptance, however, is not a basis on which to exclude a theory of causation. As we stated in *Miller*, "the general acceptance of a theory of causation in the medical community is certainly relevant to the determination of the scientific validity of a theory, but its absence is not disqualifying." 302 Or App at 193 (citing *Marcum*, 345 Or at 250-53, and *Jennings*, 331 Or at 308-09). Here, Lang supported the theory that abuse can cause this type of head trauma based on its acceptance in the pediatric medical field, her own clinical experience, and peer-reviewed

---

[3] We note that defendant also asserts that the use of the word "abusive" in abusive head trauma is not admissible scientific evidence because it assumes an intent to abuse, which is a legal question, not a medical one. We reject that argument, because the mere use of the word "abusive" or "abuse" does not *per se* make a medical causation diagnosis inadmissible under OEC 702. *See, e.g.*, *State v. Southard*, 347 Or 127, 139, 218 P3d 104 (2009) (diagnosis of sexual abuse in that case was scientifically valid under OEC 702).

literature. Defendant does not dispute the acceptance of the theory in the medical community, or Lang's own qualifications and experience, or that studies and scientific literature exist to support the theory. Rather, defendant argues that some of the biomechanical community—the only relevant community in defendant's view—is conflicted on the theory and has disputed *shaking* as a biologically plausible cause of subdural and retinal hemorrhages. That conflict alone is not a basis on which a trial court, acting as gatekeeper, should exclude abusive head trauma as a "rule in" theory of medical causation. *See Miller*, 302 Or App at 194 (reversing when the trial court based exclusion of medical causation on the lack of consensus in the medical field that physical trauma can cause fibromyalgia and holding that the conflict in the community went to the weight and not the admissibility of the evidence). We also note that that conclusion is particularly applicable here, because defendant did not challenge the differential diagnosis actually undertaken in R's case to rule in abusive head trauma, which included that R's injury was severe, hyperacute, lacked an impact injury, and included a shear injury to the brain, indicating an acceleration/ sudden deceleration, or to rule out other potential causes, which included that no other cause could be identified that could medically explain the hyperacute injury.

Likewise, defendant's arguments based on the subjective nature of an abusive head trauma diagnosis, although a relevant consideration, do not require exclusion of the testimony in this case, because those arguments are not tethered to that testimony. At the OEC 104 hearing, Lang explained that the diagnosis relies on objective components of medical testing and subjective components of the child's history to determine whether abusive head trauma should be "ruled in" as a cause. Lang also testified that the approach is amenable to peer review, because a peer physician could look at the same tests and history to arrive at the same conclusion. That is not an entirely subjective exercise; it tracks the basic methodology of a differential diagnosis and is the same methodology we determined was scientifically valid in the case of a diagnosis of physical child abuse. *See Marcum*, 345 Or at 247-49 (explaining differential diagnosis); *State v. Sanchez-Alfonso*, 238 Or App 160, 167-68, 241

P3d 1194 (2010), *rev'd on other grounds*, 352 Or 790, 293 P3d 1011 (2012) (holding that the diagnostic approach of enlisting medical testing and social history to rule in and out potential causes for injuries, leading to a medical diagnosis of physical child abuse was scientifically valid). Additionally, defendant's arguments about the lack of objective studies and controlled error rates are not a basis for exclusion when, as here, such studies cannot ethically be conducted. *See, e.g.*, *State v. Southard*, 347 Or 127, 138, 218 P3d 104 (2009) ("Where science cannot ethically provide such an indicator, we are required to look more closely at other factors that offset the unavailability of that indicator."); *Perry*, 347 Or at 124 (stating that lack of controlled studies are not "an absolute bar to the admission of expert testimony by qualified clinicians"). Defendant does not offer a more precise argument about what occurred in *this case* that would make ruling in abusive head trauma, or ruling out another proffered cause, inappropriately subjective. *Marcum*, 345 Or at 248-49 (the appropriateness of ruling in or ruling out a potential cause depends on the type of injury and causal chain posited). Based on the testimony in this case, we conclude that the state met its burden to demonstrate that the abusive head trauma diagnosis met the minimum requirements of scientific validity to be helpful to the jury under OEC 702.

That does not end our inquiry. To be admissible under *Brown* and *O'Key* scientific evidence must also be relevant under OEC 401 and must not be subject to exclusion under OEC 403. The expert testimony here was relevant to the issues the jury was asked to decide, because whether R's injury was caused by abuse while in defendant's care was a material fact at issue in the case, and the physicians' testimony that his injury was caused by abusive head trauma increased the probability of that fact's occurrence. *See Southard*, 347 Or at 139 (stating same with respect to a diagnosis that a child had been sexually abused). Defendant does not argue otherwise on appeal.

The remaining question is whether the evidence should be excluded under OEC 403, because "the probative value of the diagnosis 'is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or

needless presentation of cumulative evidence.'" *Southard*, 347 Or at 139 (quoting *Brown*, 297 Or at 438-39). In making that evaluation, *Brown* instructs that, "[n]otwithstanding the usual deference to trial court discretion [under OEC 403], we as an appellate court retain our role to determine the admissibility of scientific evidence under the Oregon Evidence Code." 297 Or at 442; *see also Southard*, 347 Or at 141 (concluding that "[*i*]*n our view*, the risk of prejudice substantially outweighs the minimal probative value of the diagnosis" (emphasis added)).

Here, defendant argues that, even if it is sufficiently reliable, the unfair prejudice from the abusive head trauma evidence outweighs its probative value and should have been excluded under OEC 403. Defendant argues that the danger of that evidence is that the jury will overvalue it because of its scientific nature and abdicate its own role to determine whether defendant subjected R to abuse. *See, e.g.*, *Brown*, 297 Or at 439-43 (concluding that polygraph evidence is inadmissible, because, even though it had some relevance and may be helpful to the jury, that value was outweighed by the risk the jury would overvalue the evidence as scientific). Defendant argues that that danger was realized in this case, because Lang testified that R's injuries were caused by abuse, based on the injuries alone.

We conclude that the evidence is admissible under OEC 403. In so concluding, we rely on the characteristics of the diagnosis in this case which distinguish it from the diagnosis at issue in *Southard*. In *Southard*, the Supreme Court was confronted with whether a diagnosis of "sexual abuse" of a child, in the absence of any physical evidence of abuse, was admissible scientific evidence. The court concluded that the evidence was scientifically valid, under OEC 702, and relevant, under OEC 401; however, the court concluded that it was inadmissible under OEC 403. The court first noted that the probative value of the evidence was "slight," because the diagnosis "did not tell the jury anything that it was not equally capable of determining on its own." 347 Or at 140. That was so, the court stated, because, if the jury credited the child's report of oral sex, then the child was necessarily sexually abused. The criteria the expert used to credit the child's

report were "essentially the same criteria that we expect juries to use every day in courts across this state to decide whether witnesses are credible." *Id.* The court then determined that the risk of prejudice was great: "The fact that the diagnosis came from a credentialed expert, surrounded with the hallmarks of the scientific method, created a substantial risk that the jury 'may be overly impressed or prejudiced by a perhaps misplaced aura of reliability or validity of the evidence.'" *Id.* at 140-41 (quoting *Brown*, 297 Or at 439). The court emphasized that the diagnosis was based on the expert's crediting the child's report, which "posed the risk that the jury will not make its own credibility determination, which it is fully capable of doing[.]" *Southard*, 347 Or at 140-41. The court concluded, "In our view, the risk of prejudice substantially outweighs the minimal probative value of the diagnosis." *Id.*

Unlike in *Southard*, here, the diagnosis of abusive head trauma was based on the physical evidence of R's injuries and the medical explanation of the significance of those various injuries, as well as the reasons why the other offered accidental causes for R's injuries were inconsistent with the full medical picture of R's condition. That is, the diagnosis of abusive head trauma was not based singularly on crediting or not crediting any person's statements; it was about evaluating R's physical injuries and whether those injuries medically matched up to the proffered causes for those injuries. In that way, the diagnosis that R's injuries were more consistent with abuse provided the jury with information that it could not equally evaluate on its own. In addition, although there is a risk that the jury could overvalue that medical causation testimony, it is the same type of risk that accompanies any medical causation testimony. We thus conclude that the probative value of the evidence was not substantially outweighed by the risk of unfair prejudice.

Accordingly, the trial court did not err in denying defendant's pretrial motion to exclude the abusive head trauma diagnosis evidence.

## *BARNES* ARGUMENT

We also address defendant's assignments of error related to the trial court's denial of his motions for judgment

of acquittal and the trial court's refusal to give his requested special jury instructions, both of which requests were based on defendant's argument that the state had to prove a mental state for the injury element in both of his charges for first-degree assault, ORS 163.185(1)(b), and first-degree criminal mistreatment, ORS 163.205(1)(b)(A).[4] Defendant was charged with a "knowingly" mental state for both charges and he argued that the state had to prove that he knew—that is, that he acted with an awareness—that he was causing serious physical injury to R, with respect to the assault charge, and knew that he was causing physical injury to R, with respect to the criminal mistreatment charge, and, failing that, that the state had to prove that he acted with criminal negligence with respect to the injury elements. The trial court denied defendant's motions for judgment of acquittal and refused to give his requested special jury instructions based on the Supreme Court's opinion in *Barnes*.

In *Barnes*, the Supreme Court addressed a charge of second-degree assault, which as charged in that case, under ORS 163.175(1)(a), is "knowingly caus[ing] serious physical injury to another[.]" The court rejected an argument by the defendant that the state had to prove that he knew that his conduct would cause a serious physical injury. The court first determined that the definition of knowingly in ORS 161.085(8) applied, even though that definition omits an application to result elements. *Barnes*, 329 Or at 336. That statute provides that "'[k]nowingly' or 'with knowledge,' when used with respect to conduct or to a circumstance described by a statute defining an offense, means that a person acts with an awareness that the conduct of the person is of a nature so described or that a circumstance so described exists." ORS

---

[4] As charged in this case, under ORS 163.185(1)(b), "[a] person commits the crime of assault in the first degree if the person *** knowingly causes serious physical injury to a child under six years of age[.]"

Also, as charged in this case, under ORS 163.205(1)(b)(A), "[a] person commits the crime of criminal mistreatment in the first degree if *** [t]he person *** having assumed the permanent or temporary care, custody or responsibility for the supervision of a dependent person *** knowingly *** [c]auses physical injury or injuries to the dependent person[.]" A "dependent person" "means a person who because of either age or a physical or mental disability is dependent upon another to provide for the person's physical needs." ORS 163.205(2)(b).

161.085(8). The court construed the assault statute and the knowingly definition "together according to their express terms and in context with the related assault statutes," and concluded that, "in a prosecution for assault in the second degree, the state needs to prove only that defendant was aware of the assaultive nature of his conduct and that his conduct in fact caused the victim serious physical injury." *Barnes*, 329 Or at 338. *See also State v. English*, 269 Or App 395, 399-400, 343 P3d 1286 (2015) (applying *Barnes* to "knowingly causes physical injury" in ORS 163.205(1)(b)(A), first-degree criminal mistreatment).

On appeal, defendant makes the same arguments he did below, acknowledging that we cannot depart from *Barnes*, a Supreme Court case. Defendant, however, also asserts that *Barnes* was wrongly decided, that the Supreme Court implicitly overruled *Barnes* in *State v. Simonov*, 358 Or 531, 368 P3d 11 (2016), and that we previously concluded that *Barnes* does not apply for purposes of *first-degree* assault in *State v. Pryor*, 294 Or App 125, 430 P3d 197 (2018).

We reject defendant's arguments. The Supreme Court did not overrule *Barnes* in *Simonov*, and the reasoning in *Simonov* is not incompatible with *Barnes.* In *Simonov*, the Supreme Court addressed the mental state that applied to an element of unlawful use of a vehicle—use of a vehicle "without the consent of the owner"—when the statute defining the offense did not provide a mental state. 358 Or at 533; ORS 164.135(1)(a) (2007), *amended by* Or Laws 2019, ch 530, § 1. To answer that question, the court addressed whether the consent element was a conduct element, which requires proof of an intentional or knowingly mental state; a result element, which requires proof of an intentional, reckless, or criminally negligent mental state; or a circumstance element, which requires proof of a knowingly, reckless, or criminally negligent mental state. *Simonov*, 358 Or at 539-40 (citing ORS 161.085(7)-(10), which define mental states). The court concluded that the consent element in ORS 164.135(1)(a) (2007) was a conduct element, because it was part of the essential nature of the prohibited act, and, as a result, the minimum culpable mental state that attached to that element was knowledge. *Id.* at 547-48. Nothing in that case casts doubt on the reasoning in *Barnes*, which addressed

whether to act knowingly in the context of assault, when the mental state was provided for in the assault statute, required the defendant to have an awareness of a particular result of the conduct or awareness of the nature of the conduct. *Simonov*, which addressed a different statute with a different structure and purpose, is not necessarily incompatible with *Barnes*.

Additionally, *Pryor* does not establish that *Barnes* does not apply to defendant's first-degree assault charge. In that case, we concluded that *Barnes* did not overrule our prior decision in *State v. Peacock*, 75 Or App 217, 706 P2d 982 (1985), in which we held that first-degree assault, when charged under ORS 163.185(1)(a),[5] which has an intentional mental state, "requires that the jury be instructed that the state must prove that a defendant intended to cause serious physical injury." *Pryor*, 249 Or App at 133. The statutory definition of "intentionally" requires that result: "'Intentionally' or 'with intent,' when used with respect to a result or to conduct described by a statute defining an offense, means that a person acts with a conscious objective to cause the result or to engage in the conduct so described." ORS 161.085(7). In so concluding, we specifically distinguished the case from *Barnes*, which involved an assault charged with a knowingly mental state and the reasoning in that case relied on the statutory definition of knowingly, which does not refer to the result elements of crimes. *Id.* at 130-31. As noted above, on both charges, defendant was charged with a knowingly mental state, and, thus, *Barnes*, a Supreme Court case that that court has not overruled, controls.[6] Accordingly, the trial court did not err.

Affirmed.

---

[5] ORS 163.185(1)(a) provides that "[a] person commits the crime of assault in the first degree if the person *** [i]ntentionally causes serious physical injury to another by means of a deadly or dangerous weapon[.]"

[6] We note that the Supreme Court has taken review of cases that raise the issue of whether *Barnes* should be overruled or limited. *State v. McKinney*, 302 Or App 309, 457 P3d 377, *rev allowed*, 366 Or 760 (2020); *State v. Shiffer*, 302 Or App 382, 457 P3d 386, *rev allowed*, 366 Or 760 (2020); *State v. Owen*, 303 Or App 176, 460 P3d 135, *rev allowed*, 366 Or 760 (2020).